**UNITED STATES COURT OF APPEALS**

**For the Fifth Circuit**

_____

No. 91-3574

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

DAVID L. LEVY and HOWARD MC NAUGHTON,

Defendants-Appellants.

Appeals from the United States District Court
For the Eastern District of Louisiana

( August 11, 1992 )

Before WISDOM, SMITH, and EMILIO M. GARZA, Circuit Judges.

WISDOM, Circuit Judge.

The defendants/appellants were convicted on several counts as active participants in a money laundering scheme and conspiracy to evade currency reporting requirements. They contend that they were not required to file currency transaction reports with respect to the alleged money laundering because their activities fell within a loophole in the law. We hold that this loophole does not exist. We are also asked to interpret the aiding and abetting statute, 18 U.S.C. § 2, so that a defendant may not be found guilty of causing

a violation to be committed by an undercover operative. We decline the offer to restrict the plain language of the statute in such a manner. Finally, one defendant contends that his sentence reflects an improper application of the Federal Sentencing Guidelines. We reject this contention.

I.  BACKGROUND

In 1987, the Internal Revenue Service and the Federal Bureau of Investigation began a joint investigation into money laundering in New Orleans. The agencies established an undercover "sting" operation utilizing the services of Mr. Amado Hernandez, a "cooperating undercover source", who posed as a money manager for drug dealers. In January 1987, Mr. Hernandez met with Mr. Charles LeChasney in Atlanta, Georgia to discuss the possibility of laundering millions of dollars in drug money. Mr. LeChasney then sought the assistance of a New Orleans attorney, Mr. David Levy.

In April 1987, Mr. Hernandez, Mr. LeChasney, and Mr. Levy met in Miami to discuss the money laundering scheme. Mr. Hernandez explained to the others that they would be exchanging cash from drug traffickers. Mr. Levy informed Mr. Hernandez that he could deposit the cash in client trust accounts and give Mr. Hernandez checks drawn against these accounts. The three men discussed bank reporting requirements and Mr. Levy agreed that Mr. Hernandez's name would not be reported in any of the transactions. The men also agreed upon a six point fee for their services.

In May 1987, Mr. Hernandez and Mr. LeChasney met with Mr. Levy

in New Orleans. Mr. Hernandez gave Mr. Levy $200,000 in cash (plus the $12,000 fee), and Mr. Levy gave Mr. Hernandez four checks totaling $200,000 drawn against one of Mr. Levy's trust accounts and signed by Mr. Levy. The cash was deposited into Mr. Levy's trust accounts over the next few days in the form of small (under $10,000) cash deposits or small cashier checks. Between May and October 1987, Mr. Levy and Mr. LeChasney laundered an additional $550,000 of cash from Mr. Hernandez, using the same basic cash for checks system utilized in the first transaction, and they received an additional $33,000 in fees.

In October 1987, Mr. Hernandez met in New York City with Mr. LeChasney, Mr. Levy, and Mr. Joe DiFlumera, an acquaintance of Mr. Levy. The men discussed laundering drug money through Mr. DiFlumera's contacts with American Airlines and Red Apple grocery stores. In November, Mr. Hernandez travelled to Boston to meet with Mr. DiFlumera. Mr. DiFlumera introduced Mr. Hernandez to Mr. Howard McNaughton, a food broker. The three men discussed a proposed money laundering operation in which Mr. DiFlumera would give Mr. Hernandez a personal check in exchange for the cash and the check would later be exchanged for a number of checks drawn against grocery accounts. The plan was to exchange cash for checks drawn on the grocery accounts, with Mr. DiFlumera's personal check serving as collateral until Mr. Hernandez received the grocery account checks. Mr. DiFlumera indicated to Mr. Hernandez that Mr. McNaughton would be in charge of the mechanics of the operation.

Over the next few weeks, Mr. Hernandez, Mr. DiFlumera, and Mr.

McNaughton discussed the operation over the telephone. They agreed upon a ten point fee. The men finally agreed to make an exchange of $200,000 in Boston on December 18, 1987. On December 18, Mr. Hernandez travelled to Boston as arranged. He gave Mr. McNaughton and Mr. DiFlumera $200,000 in cash in exchange for sixteen checks totalling $200,000. Mr. McNaughton explained to Mr. Hernandez that grocery stores could deposit large amounts of cash because they were exempt from the reporting requirements, and therefore, there would be no reporting problems with these transactions.

In January 1988, Mr. Hernandez again travelled to Boston to meet with Mr. DiFlumera and Mr. McNaughton. Again they exchanged $200,000 in cash for several checks totalling $200,000. The men agreed to meet in ten days for another exchange. This meeting never occurred, however, because Mr. Hernandez's undercover role ended on January 27, 1988 when several of the defendants were arrested.

In October 1989, a federal grand jury returned a forty-count indictment against fourteen defendants, including the appellants Mr. David Levy and Mr. Howard McNaughton. Thirty-two counts of the indictment charged Mr. Levy with: (1) conspiring as a financial institution, and in exchange for a fee, unlawfully to evade federal monetary reporting requirements by failing to file required currency transaction reports, by structuring currency transactions, and by using interstate commerce to facilitate the commission of these crimes in violation of 18 U.S.C. § 371 (the conspiracy count); (2) participating in the affairs of a racketeering

enterprise in violation of 18 U.S.C. § 1962(c) (the RICO count); (3) travelling in or using interstate commerce, or causing the use of interstate facilities in furtherance of a racketeering enterprise in violation of 18 U.S.C. §§ 2 and 1952(a)(3) (the Travel Act count); and (4) aiding and abetting the failure to file and report currency transactions and the structuring of currency transactions to evade reporting requirements in violation of 18 U.S.C. § 2 and 31 U.S.C. §§ 5313(a), 5322(b), and 5324 (the currency transaction count).

Mr. McNaughton was charged in the conspiracy count, the RICO count, and in two separate Travel Act counts.

Six of the defendants entered into plea agreements with the government prior to trial, and the district court dismissed all charges against one of the defendants under a Rule 29 motion. After a two month trial, the jury considered the guilt of the remaining seven defendants and reached a guilty verdict with respect to three of them, the two appellants and one other defendant.

The defendants who appealed were convicted on all counts in which they were named. Mr. Levy was sentenced to a total of seventy months imprisonment and three years of supervised release. Mr. McNaughton was sentenced to a total of twenty-four months imprisonment and three years supervised release. This appeal followed.

II.  DISCUSSION

A.  <u>The Definition of "Financial Institution"</u>

The Currency Transaction Reporting Act, 31 U.S.C. § 5313, authorizes the Secretary of the Treasury to issue regulations requiring that domestic financial institutions report certain domestic currency transactions.  Pursuant to this authority, the Secretary promulgated 31 C.F.R. § 103.22(a)(1) which requires that

> [e]ach financial institution . . . shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000.

Almost all of the counts against the defendants were based on the failure to file currency transaction reports (CTRs) with respect to the cash for checks transactions.  Mr. Levy and Mr. McNaughton contend on appeal that they had no obligation to file CTRs because the transactions in which they engaged did not make them "financial institutions".

Definitions of the term "financial institution" are found in the statute and in the regulations issued by the Secretary under the statute.  The defendants' first argument is that their activities do not fit within the definition of "financial institution" found in the regulations.  Their second argument is that, if their activities do fit within that definition, then the Secretary of the Treasury exceeded his authority under the statute by impermissibly enlarging the meaning of "financial institution".

1.  The Regulations

"Financial institution" is defined in the regulations as including

> [e]ach agent, agency, branch, or office within the United States of any person doing business, whether or not on a regular basis or as an organized business concern, in one or more of the capacities listed below:
> * * * *
> (3) A currency dealer or exchanger, including a person engaged in the business of a check casher.[1]

The defendants contend that they do not fall within this definition because a "currency dealer or exchanger" must be involved in the exchange of foreign currency.  This argument is without merit.

The term  "currency dealer or exchanger" is defined in the regulations as "[a] person who engages as a business in dealing in or exchanging currency, except for banks which offer such services as an adjunct to their regular services"[2].

"Currency" is defined in the regulations as

> [t]he coin and paper money of the United States or of any other country that is designated as legal tender and that circulates and is customarily used and accepted as a medium of exchange in the country of issuance. Currency includes U.S. silver certificates, U.S. notes and Federal Reserve notes. Currency also includes official foreign bank notes that are customarily used and accepted as a medium of exchange in a foreign country.[3]

---

[1]  31 C.F.R. § 103.11(g) (1987).

[2]  31 C.F.R. § 103.11(e) (1987).

[3]  31 C.F.R. § 103.11(d) (1987).

Contrary to the defendants' assertions, there is no requirement in the regulations that foreign currency be involved in the transaction. It is true that the defendants' activities were not those provided in the example given in the regulation--a person engaged in the business of a check casher. Rather, they were receiving cash from the undercover agent, and for a fee, would convert that currency into checks. The defendants argue that while the business of cashing checks is a business dealing in or exchanging currency, the business of issuing checks in exchange for cash is not. This argument elevates form over substance. Both businesses involve dealing in currency. Thus, the defendants' business of exchanging checks for cash is within the definition of "financial institution" found in the regulations.[4]

2. The Secretary's Authority

Having found that the defendants' activities fall within the definition of "financial institution" in the regulations issued by the Secretary, this Court must now consider whether the Secretary exceeded his authority by issuing this regulation. The argument runs that while the Secretary was given the authority to specify various aspects of the reporting requirements, that authority does not include the authority to expand the definition of "financial institution".

This argument rests upon a false premise. The statutory

---

[4] This Court has previously held that similar activities fall within the definition of "financial institution". See, e.g., United States v. Gollott, 939 F.2d 255 (5th Cir. 1991).

definition of "financial institution" includes "another business or agency carrying out a similar, related, or substitute duty or power the Secretary of the Treasury prescribes"[5]. Thus, Congress intended that the Secretary supplement the definition of "financial institution".[6] The regulations under which the defendants were convicted are well within that grant of authority.

B. Mr. McNaughton's Travel Act Convictions

Mr. McNaughton was convicted on counts 38 and 40, which charged that "Howard McNaughton did cause Amato [sic] Hernandez to travel from New Orleans, Louisiana, to Boston, Massachusetts, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity . . .". Mr. McNaughton raises two arguments contesting the validity of his conviction on these counts. First, Mr. McNaughton argues that he could not be convicted for causing Mr. Hernandez to travel because Mr. Hernandez was a paid government agent. Second, Mr. McNaughton argues that the evidence of his ability to cause Mr. Hernandez to travel was insufficient to support his conviction. In the context in which they are presented, these arguments are so intertwined that they must be discussed together.

---

[5] 31 U.S.C.A. § 5312(a)(2)(U) (West 1983).

[6] This conclusion is bolstered by later amendments which provide that "financial institution" includes "any other business designated by the Secretary whose cash transactions have a high degree of usefulness in criminal, tax, or regulatory matters". 31 U.S.C.A. § 5312(a)(2)(Y) (West Supp. 1992).

18 U.S.C. § 1952 makes it a crime to travel in interstate commerce to facilitate the carrying on of any illegal activity. Mr. McNaughton's liability under this statute is a result of 18 U.S.C. § 2, which provides that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal". In his opening brief, Mr. McNaughton states that "[t]here was no evidence to even suggest that Howard McNaughton or anyone other than the government had the power to cause Amado Hernandez to travel interstate". The evidence at trial, viewed in the light most favorable to the government, showed that Mr. Hernandez's travel to Boston on both occasions was at the request of Mr. McNaughton and was for the purpose of exchanging cash for checks. Mr. McNaughton's argument is that the "cause" of Mr. Hernandez's travel was the instructions he received from the government rather than the request he received from Mr. McNaughton.

Mr. McNaughton attempts to analogize his case to cases holding that a defendant cannot be convicted for conspiring solely with a government agent. There is no analogy. The essence of a conspiracy is a meeting of the minds--a shared criminal intent. Under 18 U.S.C. § 2(b), there is no requirement of shared intent; only the person charged need have the criminal intent, the individual whom the defendant has caused to perform the act may be entirely innocent.[7]

---

[7] E.g., Pereira v. United States, 202 F.2d 830, 837 (5th Cir. 1953), aff'd, 347 U.S. 1 (1954).

Nor is this a case in which the government has manufactured a crime. The defendants were aware from the outset that interstate travel would be necessary to carry out the money laundering scheme. Moreover, the evidence at trial showed that the two instances of interstate travel charged in counts 38 and 40 were at the request of Mr. McNaughton and Mr. DiFlumera. The fact that the government gave Mr. Hernandez permission to follow through on Mr. McNaughton's request does not affect the fact that Mr. McNaughton's request caused Mr. Hernandez to travel interstate for this illegal purpose.

Mr. McNaughton would have this Court interpret the phrase "causes an act" to mean that the defendant must be the sole and proximate cause of the performance of the act. Such an interpretation would render 18 U.S.C. § 2(b) meaningless. The evidence is sufficient to support Mr. McNaughton's convictions on counts 38 and 40.[8] There is no reason why Mr. McNaughton, on the pretext that Mr. Hernandez was cooperating with the government at the time, should escape the consequences of causing Mr. Hernandez to travel in interstate commerce to facilitate the money laundering scheme.

C. <u>Sentencing Guidelines</u>

Mr. Levy contends that the district court erred by adding five levels to his base offense level under the applicable sentencing

---

[8] Because we affirm Mr. McNaughton's convictions on counts 38 and 40, we do not consider his argument that his RICO conviction must be overturned if either Travel Act conviction is overturned.

guidelines.[9]  The contested increase was the result of the district court's finding that Mr. Levy believed the laundered funds were indeed criminally derived funds.  Section 2S1.3(b)(1) of the United States Sentencing Commission Guidelines provides for a five level increase when the "defendant knew or believed that the funds were criminally derived".  Although the guideline says "knew or believed", Mr. Levy argues that the five level increase applies only if he knew that the funds were criminally derived.  Further, because the funds Mr. Levy laundered were actually provided by the government, he argues that such knowledge would be impossible.

Mr. Levy relies on the Application Note to support his argument.  The "Background" section of the Application Note to § 2S1.3 states in part that "[t]he offense level is increased by five levels if the defendant knew that the funds were criminally derived".  Mr. Levy argues that this one sentence restricts the application of § 2S1.3(b)(1) to cases in which there is knowledge of the nature of the funds, not just a belief.  The interpretation of the Guidelines is a question of law, subject to de novo review.[10]

The Eleventh Circuit addressed this exact issue in United States v. Ortiz Barrera, 922 F.2d 664 (11th Cir. 1991).  That court held that the plain language of the guideline controlled because "[w]here the terminology of a statute is clear, we do not need to rely on the commentary for its construction".  We agree.

---

[9]  The guidelines at issue are those that were in effect on January 26, 1988.

[10]  United States v. Gaitan, 954 F.2d 1005, 1008 (5th Cir. 1992).

The guideline itself says "knew or believed".  There is no ambiguity in this language requiring us to look to the Application Note for guidance.[11]  A subsequent amendment to the Application Note has made it clear that a belief that the funds were criminally derived is sufficient to support the five level increase.[12]  We find it significant, as did the Eleventh Circuit, that this change to the Application Note was made without any change in the guideline itself.  "This indicates to us that the Guidelines were amended to reflect an original intent that a defendant's belief alone can trigger subsection (b)(1)."[13]

Because the language of the guideline encompasses knowledge or belief, we hold that the district court correctly applied the five level increase to Mr. Levy.

The Court has considered carefully all the arguments of the defendants/appellants not directly addressed in this opinion.

The judgment of the district court is AFFIRMED.

---

[11]    Section 1B1.7 of the Guidelines provides that the commentary accompanying the guidelines is in the nature of a policy statement or legislative history.

[12]    The amended language provides in part:  "Subsection (b)(1) applies if the defendant knew or believed the funds were criminally derived property."  The purpose of the amendment was "to clarify the guideline and commentary, to provide more complete statutory references, and to conform the format of the guideline to that used in other guidelines."    United States Sentencing Commission Guidelines Manual, Appendix C, amendment 218.

[13]    Ortiz Barrera, 922 F.2d at 666 n.4.