United States Court of Appeals,

Fifth Circuit.

Nos. 91–4934, 92–4428.

Felix J. CAMPBELL, Jr., and Annette V. Campbell, Plaintiffs,

v.

SONAT OFFSHORE DRILLING, INC., Defendant–Appellee.

UNION TEXAS PETROLEUM CORPORATION, Defendant–Third Party Plaintiff–Appellee,

v.

FRANK'S CASING CREWS & RENTAL TOOLS, INC., and Richard Kempton Webb, as Representative of Certain Underwriters at Lloyd's London, Etc., Third Party Defendants–Appellants.

Felix J. CAMPBELL, Jr., et ux, Plaintiffs,

v.

UNION TEXAS PETROLEUM CORPORATION, et al., Defendants–Appellees,

v.

Richard Kempton WEBB, Etc., Defendant–Appellant.

Dec. 30, 1992.

Appeals from the United States District Court for the Western District of Louisiana.

Before KING, WILLIAMS and SMITH, Circuit Judges.

KING, Circuit Judge:

Felix J. Campbell brought this action against Union Texas Petroleum Corporation ("UTP") and Sonat Offshore Drilling, Inc. ("Sonat")[1] to recover for injuries allegedly sustained by Campbell as he attempted to transfer from the M/V TRUDY BRUCE, a vessel hired by UTP, to Sonat's drilling vessel, the OFFSHORE TAURUS. At the time he was injured, Campbell was employed by Frank's Casing Crew and Rental Tools, Inc. ("Frank's"), which was hired by UTP to perform casing services for an offshore drilling operation on the outer continental shelf.

---

[1]Bruce Boats Rental, Inc. is also a defendant in the underlying action brought by Campbell but is not a party to the motions for summary judgment involving UTP's Third Party Complaint. Also, Annette Campbell was originally a plaintiff in this action, but the district court dismissed her for failure to state a claim upon which relief can be granted.

Soon after Campbell brought this action against UTP and Sonat, UTP filed a Third Party Complaint against Frank's and its insurers, Certain Underwriters at Lloyd's and Companies ("Lloyd's"). UTP sought defense and indemnity for itself and Sonat pursuant to the terms of a contract between UTP and Frank's which governed the work Campbell was performing at the time he was injured. UTP then moved for summary judgment on this issue of Frank's duty to defend and indemnify; Frank's and Lloyd's (together "defendants") filed cross-motions for summary judgment on this same issue. Holding that Frank's must indemnify UTP and Sonat, the district court granted partial summary judgment in their favor. Defendants appeal, asserting that (1) Frank's never agreed to indemnify UTP or Sonat, (2) Louisiana law applies and invalidates any indemnity agreement between Frank's and UTP, (3) the Longshore and Harbor Workers Compensation Act (LHWCA), 33 U.S.C. § 901 et seq., prohibits any agreement by Frank's to indemnify Sonat, and, (4) if liable at all, Frank's is not liable to indemnify UTP and Sonat for more than $300,000. Finding that Frank's is obligated to indemnify UTP and Sonat pursuant to the terms of agreements between UTP and Frank's and UTP and Sonat, we affirm the district court's grant of partial summary judgment in favor of UTP and Sonat on this issue of indemnity.

## I. BACKGROUND

This case arises out of UTP's efforts to drill a well in the outer continental shelf off the coast of Louisiana. To accomplish this, UTP hired a drilling vessel—the OFFSHORE TAURUS—from Sonat, and entered into a verbal agreement with Frank's to provide drive pipe, hammer work, and casing services[2] on board the OFFSHORE TAURUS.

Campbell, a member of the casing crew provided by Frank's, was allegedly injured on December 10, 1988 while attempting to transfer from the M/V TRUDY BRUCE to the OFFSHORE TAURUS in adverse weather conditions on the high seas. Following Campbell's injury, Frank's continued to provide casing services for UTP and, on December 21, UTP issued a written purchase order to Frank's detailing the equipment and services provided. The back of this purchase order

---

[2]"Casing" is an oil and gas term meaning the welding together and hammering of pipe into the subsurface of the earth to create a permanent construction.

contains a provision for indemnification[3] and another establishing insurance requirements.[4] The purchase order also contains a provision which designates the laws of Texas as those governing the agreement.

Campbell brought this suit against UTP and Sonat to recover for the injuries he sustained on December 10, 1988. UTP, on its own behalf and on behalf of Sonat, then filed a Third Party

[3]Specifically, the indemnity statement on the back of the UTP-issued purchase order provides as follows:

> 12. INDEMNIFICATION.
>
> (a) Seller [Frank's] and Buyer [UTP] shall indemnify and hold each other and their employees harmless for damages to, or loss of their and their respective employees' property and for injury to, or death of, their respective employees, whether or not caused by the sole or concurrent negligence of [Frank's] or [UTP]....
>
> * * *
>
> (b) The term [Frank's] shall include its subsidiaries, affiliated and parent companies, agents and subcontractors, and the term [UTP] shall include its subsidiaries, affiliated and parent companies, agents, joint venturers and other contractors engaged by [UTP]. The indemnities provided herein shall include, but are not limited to, the cost to defend, including legal and investigative expenses, any claim or action covered by such indemnities. The indemnity obligations as contained herein shall survive the termination of this contract.

[4]The insurance statement provides as follows:

> 13. INSURANCE. Contractor agrees to carry and maintain during the term of this agreement the following:
>
> * * *
>
> (b) Comprehensive General Liability insurance, specifically endorsed to cover the indemnity agreements contained in this contract, with limits of $1,000,000.00 each accident for bodily injury and property liability combined.
>
> All insurance policies of [Frank's], including but not limited to those described herein, shall expressly waive subrogation as to [UTP], its subsidiary, affiliated and parent companies, agents, joint venturers and other contractors engaged by [UTP]. The insurance required hereunder shall not void or limit [Frank's] indemnity obligations as contained in this contract.

Complaint against defendants for contractual defense and indemnity. All parties moved for summary judgment on this issue, UTP asserting that its purchase order constitutes a contract between the parties and that, in accordance with the indemnity provision on the back of the order, Frank's must indemnify. UTP also moved to strike the affidavit of Robert Gilbert, a Frank's employee, submitted by Frank's in opposition to UTP's Motion for Partial Summary Judgment on the grounds that this affidavit constitutes parol evidence intended to vary the terms of a written contract. The district court granted UTP's motions[5] and denied those of defendants, holding that defendants must indemnify UTP and Sonat. Defendants appeal.

## II. STANDARD OF REVIEW

In considering the defendants' appeal from the district court's grant of partial summary judgment in favor of UTP and Sonat, we review the record de novo. *See Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992); *International Shortstop, Inc. v. Rally's,* 939 F.2d 1257, 1263 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). Our standard is well settled: Summary judgment is proper if the party moving for such a judgment establishes that there is an absence of genuine issues of material fact. *See* FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Ind. Col. v. Zenith Radio Corp.,* 475 U.S. 574, 585–88, 106 S.Ct. 1348, 1355–57, 89 L.Ed.2d 538 (1986). Once a movant has made such a showing, the nonmovant must establish each of the challenged essential elements of its case for which

---

[5]The district court initially struck the entire Gilbert affidavit without stating its reasons. Nevertheless, Lloyd's moved for reconsideration and, in denying that motion, the district court stated that "the Affidavit dealt with the issue of Frank's intent in entering the Purchase Order. Since the contract was clear and unambiguous, we believe the parol evidence concerning Frank's intent to be inadmissible."

Richard Webb, as the representative of Lloyd's, appealed this issue separately, and, because Webb failed to file a petition for permission to bring an interlocutory appeal pursuant to Rule 5 of the Federal Rules of Appellate Procedure, this court dismissed Webb's interlocutory appeal for lack of subject matter jurisdiction. Nevertheless, Webb's action was consolidated with the case before us, and defendants now raise this issue again on appeal. We address it *infra* at Part III.E.

it will bear the burden of proof at trial. *See Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552; *Topalian,* 954 F.2d at 1131. Although the nonmovant may satisfy this burden by tendering depositions, affidavits, and other competent evidence,[6] "[m]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment." *Topalian,* 954 F.2d at 1131 (citations omitted). In short, "the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). Where the nonmoving party fails to make such a showing and the moving party has met its summary judgment burden, the latter is entitled to summary judgment as a matter of law. FED.R.CIV.P. 56(c).

## III. DISCUSSION

Defendants raise the following contentions on appeal: (a) the UTP–Frank's purchase order does not constitute a contract in effect at the time of Campbell's injury; (b) even if this agreement does constitute a contract in effect at the time of Campbell's injury, it is not maritime in nature and, therefore, it is governed by Louisiana law; (c) the indemnity provision of the UTP–Frank's agreement falls within the LHWCA's proscription against such indemnity provisions; (d) if liable at all, Frank's is not liable to indemnify UTP for more than $300,000; and (e) the district court erred in striking the Gilbert affidavit.

A. The UTP–Frank's Agreement

According to defendants, "the purchase order issued to Frank's by [UTP] thirteen days after the accident occurred cannot obligate Frank's to defend and indemnify [UTP] or Sonat." However, in response to UTP's and Sonat's assertion in their Third Party Complaint that, "[a]t all times pertinent, there was in full force and effect between [Frank's] and [UTP] a contract pursuant to which [Frank's] was required to defend, protect, indemnify and hold harmless [UTP] and [Sonat] from and against the claims filed by [the Campbells]," Frank's admitted "that there exists between [Frank's] and [UTP] a contract, which contract being a written instrument is the best evidence of its terms and conditions all of which are pled herein...."

We have held repeatedly that "factual assertions in pleadings are ... judicial admissions

---

[6]*See* FED.R.CIV.P. 56(e); *Rally's,* 939 F.2d at 1263.

*conclusively* binding on the party that made them." *Davis v. A.G. Edwards & Sons, Inc.,* 823 F.2d 105, 108 (5th Cir.1987) (emphasis in original), *quoting White v. ARCO/Polymers, Inc.,* 720 F.2d 1391, 1396 (5th Cir.1983); *see Ferguson v. Neighborhood Housing Services, Inc.,* 780 F.2d 549, 551 (6th Cir.1986) (facts admitted in pleadings are no longer at issue). Moreover, our reliance on Frank's original response to UTP's assertion that a contract was in force at the time of Campbell's accident is buttressed by evidence that (1) UTP and Frank's have conducted business on a regular, continuous basis for years, (2) it is common pract ice between UTP and Frank's for individual purchase orders to postdate the services rendered, (3) the basic indemnity language in these UTP–Frank's contracts has remained constant, and, (4) as for the specific contract at issue, UTP paid Frank's in accordance with the contract's terms and Frank's accepted that payment without objection. Where parties share a history of business dealings and standardized provisions have become part of those dealings, such familiar provisions within purchase orders issued after performance are binding where they are accepted without objection. *See Grillet v. Sears, Roebuck & Co.,* 927 F.2d 217, 220 (5th Cir.1991) ("A party cannot be permitted to retain the benefits received under a contract and at the same time escape the obligation imposed by the contract."), *superseded by statute, Oberg v. Allied Van Lines, Inc.,* 1992 WL 186098 (N.D.Ill. July 24, 1992) (No. 91 C 6576); *see also M/V American Queen v. San Diego Marine Constr. Corp.,* 708 F.2d 1483, 1488–89 (9th Cir.1983) (in holding that standardized form of ship repair contract was enforceable even though executed after work was performed, recognizing that "it is a practice in the ship repair industry to do repair work before sending an invoice containing the contract for repairs"); *Hudson Waterways Corp. v. Coastal Marine Serv., Inc.,* 436 F.Supp. 597, 604–05 (E.D.Tex.1977) (past business dealings provided sufficient notice to vessel owner that clause was implied in every repair contract). Accordingly, we conclude that the UTP–Frank's purchase order constitutes a contract between the parties in force at the time of Campbell's accident.

B. The Maritime Nature of the UTP–Frank's Agreement

Having determined that the UTP–Frank's purchase order constitutes a contract, we must consider defendants' challenge to the district court's conclusion that this contract is maritime in nature.

According to defendants, "the Frank's [casing] crew was performing a task that was inherently non-maritime in nature, i.e. driving casing into the seabed of the Outer Continental Shelf. This fact alone is enough to invoke the application of Louisiana law pursuant to the mandates of the Outer Continental Shelf Lands Act."[7] We disagree.

> The Outer Continental Shelf Lands Act (OCSLA) provides, in pertinent part, that:

> To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf....

43 U.S.C. § 1333. To decide whether state law applies under the OCSLA, this court has set forth the following test:

> [F]or adjacent state law to apply as surrogate federal law under OCSLA, three conditions are significant. (1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law.

*Smith v. Penrod Drilling Corp.,* 960 F.2d 456, 459 (5th Cir.1992), *quoting Union Texas Petroleum Corp. v. PLT Eng'g,* 895 F.2d 1043, 1047 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990); *see also Rodrigue v. Aetna Cas. & Surety Co.,* 395 U.S. 352, 355–66, 89 S.Ct. 1835, 1837–42, 23 L.Ed.2d 360 (1969); *Hollier v. Union Texas Petroleum Corp.,* 972 F.2d 662, 664 (5th Cir.1992).

The district court focused upon the second factor of this OCSLA test—the applicability of maritime law. Applying a two-part test introduced by this court in *Davis & Sons, Inc., v. Gulf Oil Corp.,* 919 F.2d 313 (5th Cir.1990), to determine whether a contract is maritime, the district court found that Louisiana law under the OCSLA is inapplicable because the UTP–Frank's purchasing order constitutes a maritime contract.

In *Davis,* we addressed whether a blanket agreement and subsequent work orders linked to

---

[7]According to defendants, this case is governed by the Louisiana Oilfield Anti–Indemnity Act, LA.REV.STAT.ANN. § 9:2780 (West 1991 & Supp.1992).

offshore oil and gas production constituted a maritime contract. In finding that they did, we held that:

> Determination of the nature of a contract depends [A] in part on historical treatment in the jurisprudence and [B] in part on a fact-specific inquiry. We consider six factors in characterizing the contract: 1) what does the specific work order in effect at the time of injury provide? 2) what work did the crew assigned under the work order actually do? 3) was the crew assigned to work aboard a vessel in navigable waters? 4) to what extent did the work being done relate to the mission of that vessel? 5) what was the principal work of the injured worker? and 6) what work was the injured worker actually doing at the time of injury?

*Id.* at 316. In accordance with the first part of the *Davis* test, the district court looked to this court's established jurisprudence and found precedent that a contract to provide casing services is maritime. *See Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329, 332 & n. 1 (5th Cir.1981) (holding that federal maritime law, rather than Louisiana law, controls construction of indemnity clause in purchase order for casing service), *citing Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge,* 424 F.2d 684, 691 (5th Cir.) (contract for drilling work is maritime contract), *cert. denied,* 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970); *see also Davis,* 919 F.2d at 315 & n. 5 (noting confusion as to whether contracts linked to offshore gas and oil production are governed by state or maritime law) (citations provided); *Halliburton Co. v. Norton Drilling Co.,* 302 F.2d 431, 437 (5th Cir.1962) (maritime law controls drilling contract), *cert. denied,* 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (1963). The district court then applied the fact-specific inquiry prescribed in *Davis,* and held that:

> All six of the *Davis* factors support our finding that the contract was maritime. (1) The work contract between UTP and Frank's called for Frank's to deliver driver pipe and a hammer crew to the TAURUS, a vessel, to drive pipe into the seafloor. (2) The actual work, performed from December 10 to December 13, 1988 involved the driving or "hammering" of pipe into the seafloor, the welding of the next length of pipe to that already driven, and continued driving. (3) The work took place on a vessel, a special purpose watercraft, in navigable waters. (4) The labor the Frank's crew performed using the draw works and tackle of the vessel was "inextricably intertwined" with [the] mission of the TAURUS. *Davis,* 919 F.2d at 317. (5) The principal work of the injured party, Campbell, was welding which is also necessary for Frank's to complete its task. (6) Finally, Campbell was allegedly injured when attempting to board the TAURUS in rough seas from the M/V TRUDY BRUCE.

We agree with the district court. As we stated in *Davis,* "[t]he attempt to determine whether a contract, particularly one linked to offshore gas and oil production, is governed by state or maritime law has led to much confusion." 919 F.2d at 315. We also stated that this confusion, and what appear to be inconsistencies in our holdings, "can be traced to the highly fact-specific nature of the inquiry necessary to determine whether a contract is governed by maritime law." *Id.* Although the

maritime/non-maritime line running through our jurisprudence concerning the nature of contracts linked to offshore gas and oil production is somewhat difficult to discern, we find that *Corbitt* and the authority undergirding this decision are enough to satisfy the threshold portion of the *Davis* test.[8]

We also agree with the district court's fact-specific inquiry under the second part of the *Davis* test. In challenging these *Davis* findings, defendants rely primarily upon our holdings in *Domingue v. Ocean Drilling and Exploration Co.,* 923 F.2d 393 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 874, 116 L.Ed.2d 779 (1992), and *Thurmond v. Delta Well Surveyors,* 836 F.2d 952 (5th Cir.1988). In *Domingue,* the issue before this court was whether a contract to perform wireline

---

[8]It has been long established that a legally indistinguishable decision of this court must be followed by other panels of this court and district courts unless overruled en banc or by the United States Supreme Court. *See, e.g., Sturgeon v. Strachan Shipping Co.,* 698 F.2d 798, 800 (5th Cir.1983), *cert. denied,* 469 U.S. 883, 105 S.Ct. 251, 83 L.Ed.2d 188 (1984); *United States v. Kirk,* 528 F.2d 1057, 1063 (5th Cir.1976). Moreover, it is "settled law in this circuit that the inconsistency between two conflicting lines of Fifth Circuit authority must be resolved in favor of the earlier line of cases." *See O'Dell v. North River Ins. Co.,* 614 F.Supp. 1556, 1558 (W.D.La.1985).

Defendants assert that the district court's reliance on *Corbitt* is misplaced, for, according to defendants, in *Herb's Welding, Inc. v. Gray,* 470 U.S. 414, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985), the Supreme Court "rejected this Circuit's "expansive view of maritime employment' to find that activities associated with the exploration and development of oil and gas are inherently non-maritime in nature." We disagree.

In *Herb's Welding,* the Court held that a welder injured while working on a *fixed* oil production platform in *state* waters was not engaged in "maritime employment" within the meaning of the LHWCA, 44 Stat. 1424, *as amended,* 33 U.S.C. § 901 et seq. The court clearly stated that "drilling platforms were not even suggestive of traditional maritime affairs" and that "[t]here is nothing inherently maritime" about maintaining such platforms. 470 U.S. at 422, 105 S.Ct. at 1428. The Court also distinguished fixed and floating drilling structures, noting that floating rigs are vessels and that workers on such rigs enjoy maritime remedies. *Id.* at 416 n. 2, 105 S.Ct. at 1424 n. 2; *see also Hollier,* 972 F.2d at 664 (where well-tester was killed transferring from a stationary jackup vessel to a well platform, finding platform constitutes OCSLA situs and that maritime law is not applicable, and noting that "[i]t is well established that a platform is an "artificial island' within the meaning of OCSLA" and that "[a] jackup boat, however, is generally considered to be a vessel, not an artificial island") (citations omitted).

In sum, as we explained in *Fontenot v. AWI, Inc.,* 923 F.2d 1127, 1131 (5th Cir.1991), the reasoning of *Herb's Welding* justifies the drawing of a distinction between oilfield workers on vessels navigating on the high seas and those on fixed platforms in state waters. *Herb's Welding* does not address whether maritime or state law governs a contract for services performed on a vessel where a casing crew employee was injured while transferring from one vessel to another on the high seas—the scenario in the case before us.

services aboard a drilling vessel was governed by maritime or Louisiana law. This wireline work involved services to "partially drilled oil and gas wells and also [gathering] geophysical data relevant to production." 923 F.2d at 394 n. 3. Domingue was not employed by either party to the contract at issue, and his work—well testing—was unrelated to the wireline operations which were the subject of this contract. *Id.* at 395. In the absence of evidence that the vessel's equipment was in any way utilized to perform these wireline services or that these services were significantly related to the vessel's mission, we concluded that the vessel in *Domingue* merely served "as a work platform" upon which the wireline services were performed and that such services were only incidentally related to the vessel's mission. 923 F.2d at 397. Similarly, *Thurmond* involved wireline services and maintenance to a structure characterized as "a fixed platform" or "small ... island" located within Louisiana's territorial waters, and the plaintiff's injury resulted from a defect in this platform. 836 F.2d at 955. In short, *Domingue* is controlled by the nonmaritime nature of Domingue's work and the fact that he performed a service only remotely related to the mission of the vessel, and *Thurmond* is controlled by jurisprudence establishing that operations performed on fixed platforms in state waters are non-maritime in nature. *See Herb's Welding,* 470 U.S. at 422, 425, 89 S.Ct. at 1426, 1428; *Rodrigue v. Aetna Cas. & Sur. Co.,* 395 U.S. 352, 361–66, 89 S.Ct. 1835, 1840–42, 23 L.Ed.2d 360 (1969).

As stated above, Campbell was injured on the high seas when transferring from one vessel, the TRUDY BRUCE, to another,[9] the OFFSHORE TAURUS—a jackup drilling rig, which is one of the special-purpose watercraft that this court has explicitly characterized as vessels.[10] *See*

---

[9]In *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986), the Supreme Court recognized the importance of such circumstances when characterizing the nature of a contract under the OCSLA. Specifically, where drilling platform workers were killed while being transported by helicopter from their work to the mainland, the Court held that, "[a]lthough the decedents were killed while riding in a helicopter and not a more traditional maritime conveyance, that helicopter was engaged in a function traditionally performed by waterborne vessels: the ferrying of passengers from an "island,' albeit an artificial one, to the shore." *Id.* at 219, 106 S.Ct. at 2492.

[10]As recognized by this court in *Domingue,* "[w]e have consistently applied general maritime law and the Jones Act guidelines set down by this court through Judge Wisdom in *Offshore Co. v. Robison,* 266 F.2d 769 (5th Cir.1959), to accidents aboard special-purpose watercraft such as ... jackup ... rigs." 923 F.2d 393, 394 n. 1 (5th Cir.1991), *citing Houston Oil & Minerals Corp. v.*

*Domingue,* 923 F.2d at 394 n. 1; *Lewis v. Glendel Drilling,* 898 F.2d 1083, 1088 (5th Cir.1990) (commenting that en banc review would be necessary to treat special purpose vessels as artificial islands); *Theriot v. Bay Drilling Corp.,* 783 F.2d 527, 538–39 (5th Cir.1986). Although it is conceivable that a vessel such as the OFFSHORE TAURUS may be used as a mere work platform to execute a particular service contract, *see Domingue,* 923 F.2d at 397, this is not the case before us.[11] Campbell was a member of a casing crew which, using the OFFSHORE TAURUS's equipment—for example, the vessel's derrick and draw works—to accomplish their task, was contracted to travel upon the OFFSHORE TAURUS and perform their work from the vessel, the mission of which was to drill oil and gas wells over navigable waters. In other words, the work performed by Campbell and the rest of Frank's crew was "inextricably intertwined with maritime

---

*American Int'l Tool Co.,* 827 F.2d 1049, 1053 (5th Cir.1987) ("[T]he applicability of maritime law to these *Robison*-defined special-purpose watercraft is unassailably established."), *cert. denied,* 484 U.S. 1067, 108 S.Ct. 1031, 98 L.Ed.2d 995; *Vickers v. Chiles Drilling Co.,* 822 F.2d 535, 537 (5th Cir.1987) (Jones Act and maritime law applied on jackup rig).

[11]*See supra* note 8 (distinguishing *Herb's Welding* from this case and explaining the difference between fixed and floating platforms). As explained by the Supreme Court in *Offshore Logistics,* 477 U.S. at 207, 106 S.Ct. at 2485, the intent behind the OCSLA was to remove artificial islands, not vessels, from maritime law:

> The intent behind OCSLA was to treat the artificial structures covered by the Act as upland islands or as federal enclaves within a landlocked State, and not as vessels, for purposes of defining the applicable law because maritime law was deemed inapposite to these fixed structures. *See Rodrigue v. Aetna Cas. & Sur. Co.,* 395 U.S. 352, 361–66, 89 S.Ct. 1835, 1840–42, 23 L.Ed.2d 360 (1960). This Court endorsed the congressional assumption that admiralty law generally would not apply to the lands and structures covered by OCSLA in *Rodrigue,* noting that accidents on the artificial islands covered by OCSLA "had no more connection with the ordinary stuff of admiralty than do accidents on piers." *Id.* at 360, 89 S.Ct. at 1839–40.

*Offshore Logistics,* 477 U.S. at 217, 106 S.Ct. at 2491 (citations omitted). In the case before us, the OFFSHORE TAURUS was functioning in its capacity as a special-purpose vessel rather than as an "island," and, therefore, it is unlikely that the OFFSHORE TAURUS even constitutes an OCSLA situs. *See* 43 U.S.C. § 1333 (stating that the Act applies to "artificial islands and fixed structures"); *Rodrigue,* 395 U.S. at 355, 360, 89 S.Ct. at 1837, 1839–40 (purpose of Lands Act was to treat artificial islands as enclaves rather than as vessels). Nevertheless, the parties have not properly briefed this issue and, finding that the contract at issue is maritime in nature, we do not reach it. *See Atwood v. Union Carbide Corp.,* 847 F.2d 278, 280 (5th Cir.1988), *cert. denied,* 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989).

activities since it required the use of a vessel and its crew."[12]  *Davis,* 919 F.2d at 317;  *see also*

*McDermott Intern., Inc. v. Wilander,* 498 U.S. 337, —— – ——, 111 S.Ct. 807, 817–18, 112

L.Ed.2d 866 (1991) (the work of a paint foreman contributes to the function of a paint boat and the

accomplishment of its mission);  *Offshore Co.,* 266 F.2d at 779 (the work of a roustabout contributes

to the mission of a submersible drilling barge).

In sum, Campbell was injured while working as part of a crew contracted to travel upon and

enable a special-purpose vessel to perform the function for which that vessel was designed.  The

vessel nature of THE OFFSHORE TAURUS is therefore controlling in this case, and we find that

the underlying contract between Frank's and UTP, a contract for services to enable THE OFFSHORE

TAURUS to complete its mission, is maritime in nature.

C. Validity of the Indemnity Provision

Section 905(b) of the LHWCA protects the employers of those engaged in shore-based

maritime employment from indemnification claims brought by vessels in instances where the

negligence of vessels causes injuries to these maritime employees.  Specifically, section 905(b)

provides, in pertinent part, that,

> [i]n the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.

33 U.S.C. § 905(b).  However, with the enactment of section 905(c) in the 1984 amendment to the

LHWCA, Congress created the following exception to 905(b)'s proscription of indemnity for

instances in which employers and vessels enter into reciprocal agreements to defend and indemnify

each other:

> Nothing contained in subsection (b) of this Section shall preclude the enforcement according

---

[12]To determine whether an employee's work is maritime in nature, we focus upon the purpose of the work, not solely upon the particular skills used. *Trotti & Thompson v. Crawford,* 631 F.2d 1214, 1221 n. 16 (5th Cir.1980).  The contract between Frank's and UTP "did not merely touch incidentally on [the OFFSHORE TAURUS]," but directly addressed its operation as a drilling vessel in navigable waters. *Theriot,* 783 F.2d at 538.  "Oil and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce." *Id.* at 538–39 (footnote distinguishing *Herb's Welding,* 470 U.S. at 422, 89 S.Ct. at 1426, omitted).

to its terms of any reciprocal indemnity provision whereby the employer of a person entitled to receive benefits under t his chapter by virtue of Section 1333 of Title 43 and the vessel agreed to defend and indemnify the other for cost of defense and loss or liability for damages arising out of or resulting from death or bodily injury to their employees.

33 U.S.C. § 905(c). Frank's asserts that Sonat's claim for indemnity is independent of UTP's claim and that, because Sonat was not a signatory to the UTP–Frank's purchase order and owes no indemnity under t hat contract, Sonat has failed to satisfy 905(c)'s reciprocity requirement.[13] We

---

[13]Frank's also raises a second challenge to the applicability of section 905(c)—a challenge that reaches UTP's right to indemnity from Frank's pursuant to the UTP–Frank's purchase order. According to Frank's, section 905(c) applies only to employees entitled to LHWCA benefits *exclusively* by virtue of the OCSLA, and that "Campbell was an LHWCA worker without benefit to OCSLA."

It is unclear whether or not Lloyd's shares this position. Although Lloyd's actually presented this argument on behalf of defendants during their oral argument before this court, Lloyd's has briefed admissions to the contrary. Specifically, in the original brief it submitted to this court on behalf of defendants, Lloyd's states that "Sonat is the party seeking indemnity whose right to indemnify is questioned by Appellants based upon the 905(b) prohibition." Moreover, in the Reply Brief Lloyd's submitted to this court on behalf of defendants, Lloyd's readily acknowledges that UTP is entitled to indemnification pursuant to the UTP–Frank's agreement, stating that "Underwriters and Companies solely contest Sonat's right, as a vessel, to seek indemnity from Frank's, the employer, on the basis of § 905(b). Underwriters and Companies are not arguing that Union Texas cannot secure indemnity on the basis of 905(b), or that Union Texas has not met the requirements of 905(c)."

Nevertheless, we need not address these inconsistencies in defendants' positions, for, in ruling on the parties' motions for reconsideration, the district court held that "[w]hether Lloyd's owed indemnity was not properly before the court as issues of coverage still may remain." Accordingly, the district court struck its reference to Lloyd's from the conclusion in its ruling conclusion that "Union Texas and Sonat were owed indemnity by "Frank's and Lloyd's.' " On appeal, UTP and Sonat merely address Lloyd's status in the present action in a footnote, and defendants have not raised a challenge to this decision to strike Lloyd's. Accordingly, we address only Frank's challenges to the district court's determination that Frank's must indemnify Sonat and UTP. *See Atwood v. Union Carbide Corp.,* 847 F.2d 278, 280 (5th Cir.1988) ("[i]ssues not briefed, or set forth in the list of issues presented, are waived.") (citations omitted), *cert. denied,* 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989).

Moreover, Frank's did not properly raise its contention regarding the LHWCA/OCSLA status of Campbell under section 905(c) before the district court and, therefore, we will not address it now. *See United States v. All Star Indus.,* 962 F.2d 465, 476 (5th Cir.) (holding that such belated contentions are only reviewed for plain error—in other words, whether failure to consider them results in manifest injustice) (citations omitted), *cert. denied,* —— U.S. ——, 113 S.Ct. 377, —— L.Ed.2d —— (1992); *see also United States v. Sherbak,* 950 F.2d 1095, 1101 (5th Cir.1992) ("[I]ssues raised for the first time on appeal "are not reviewable by this [c]ourt unless they involve purely legal questions and failure to consider them would result in manifest injustice.' ") (citations omitted).

disagree.

The legislative history behind section 905(c) is sparse,[14] and the only guiding authority presented by the parties is found in a footnote to this court's opinion in *Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207 (5th Cir.1986). In *Fontenot,* where the owner of a drilling vessel and a petroleum company entered into a reciprocal agreement to indemnify each other "for injuries sustained by [their own] personnel, contractors, and property[,]" we stated that "[t]his type of mutual provision is precisely the type envisioned in and sanctioned by the 1984 amendments to the Longshoremen's and Harbor Workers' Compensation Act." *Id.* at 1213 n. 3 (citations omitted).[15]

The Supreme Court has stated that, when interpreting statutory provisions, "[o]ur task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, "that language must ordinarily be regarded as conclusive.'" *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982) (citations omitted); *see also United States v. Levy,* 969 F.2d 136, 142 (5th Cir.1992) (refusing to restrict plain language of the aiding and abetting statute). The plain language of section 905(c) requires reciprocity between vessels and employers wishing to enter into agreements to indemnify, not privity. Although Sonat may not have agreed to directly indemnify Frank's pursuant to the UTP–Frank's agreement, it did agree to do so pursuant to the drilling contract entered into by Sonat and UTP. Specifically, just as Frank's expressly agreed to indemnify Sonat and UTP's other contractors for claims brought by Frank's employees, Sonat agreed to hold Frank's and UTP's other contractors

> harmless from and against all claims, demands[,] and causes of action of every kind and character, without limit and without regard to the cause(s) thereof or the negligence of any party or parties (including [UTP] and its other contractors) arising in connection herewith,

---

[14]The only recognizable reference to section 905(c) found in the authoritative legislative history behind the 1984 amendment to the LHWCA simply states that "the substitute removes the current proscription with respect to mutual indemnity agreements between employers and vessels as applied to the Outer Continental Shelf by virtue of the Outer Continental Shelf Lands Act." Pub.L. No. 98–426, *reprinted in* 1984 U.S.C.C.A.N. 2734, 2774–75.

[15]UTP and Sonat also rely upon our holding in *Doucet v. Gulf Oil Corp.,* 783 F.2d 518 (5th Cir.), *cert. denied,* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986). However, in *Doucet,* rather than defining what constitutes reciprocity in satisfaction of section 905(c), we simply stated that "section 905(c) removes section 905(b)'s proscription to the extent that indemnity agreements between vessels and employers are reciprocal." *Id.* at 525.

for injury to or illness or death of [Sonat's] employees and for all damage to, loss or destruction of property of [Sonat's] employees.

In sum, Sonat and Frank's were brought together by UTP *solely* for the purpose of carrying out UTP's oil-drilling operation.[16] In contracting with UTP, Frank's and Sonat explicitly agreed to indemnify each other, and these agreements are unambiguous and completely reciprocal. *See supra* note 3 (quoting the indemnification provision of the UTP–Franks' agreement); *see also Babcock v. Continental Oil Co.,* 792 F.2d 1346, 1351–53 (5th Cir.1986) (where contractor agreed to indemnify platform owner and its contractors for claims resulting from negligence of platform owner and/or its contractors, holding that negligent contractor who was not a signatory to the indemnity agreement was entitled to indemnity); *Mills v. Zapata Drilling Co.,* 722 F.2d 1170, 1174 (5th Cir.1983) (where language similar to that contained in the instant contract was at issue, finding it "preposterous for [the contractor] to argue that the indemnity agreement is ambiguous."), *overruled on other grounds, Kelly v. Lee's Old Fashioned Hamburgers, Inc.,* 908 F.2d 1218 (5th Cir.1990) (en banc). Accordingly, we conclude that the reciprocity requirement of section 905(c) has been satisfied and that the absolute privity requirement between vessels and employers which Frank's reads into section 905(c) is beyond the statute's plain language.[17] *Cf. Federal Marine Terminals v. Burnside Shipping Co.,* 394 U.S. 404, 418–21, 89 S.Ct. 1144, 1152–54, 22 L.Ed.2d 371 (1969) (suggesting that reciprocity can exist without privity, so as to require indemnity).

D. Validity of the Amount of the Indemnity Provision

We have held that the UTP–Frank's agreement is maritime in nature, and, "under admiralty law, where the parties have included a choice of law clause, the state's law will govern *unless* [1] the state has no substantial relationship to the parties or the transaction *or* [2] the state's law conflicts with the fundamental purposes of maritime law." *Stoot v. Fluor Drilling Serv., Inc.,* 851 F.2d 1514, 1517 (5th Cir.1988) (emphasis added). The UTP–Frank's agreement contains a choice of law

---

[16]The cases relied upon by the parties suggest that such arrangements are standard in the oil and gas industry. *See, e.g., Domingue,* 923 F.2d at 394; *Union Texas,* 895 F.2d at 1045–46; *Fontenot,* 791 F.2d at 1210; *Corbitt,* 654 F.2d at 331.

[17]We note that Frank's has not presented this court with any jurisprudence or substantive LHWCA–OCSLA policy analysis to support such a privity requirement.

provision stating that "[t]his order shall be governed by the laws of the State of Texas[,]" and a related insurance provision requiring the parties to carry $1,000,000 in general liability coverage. *See supra* note 4 (quoting this insurance provision). Because UTP is headquartered in Texas, we conclude that Texas has a substantial relationship to the contracting parties. We also conclude that the UTP–Frank's indemnity agreement is enforceable under Texas law,[18] and that application of Texas law in the instant case would not conflict with "the fundamental purposes of maritime law." *See Fontenot,* 791 F.2d at 1214 (stating that, under maritime law, "[a] contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties" ), *quoting Corbitt,* 654 F.2d at 333.

The parties disagree as to which version of Texas law governs the UTP–Frank's indemnity agreement. Specifically, at the time Campbell was injured (December 10, 1988), Texas law provided that Frank's was required to secure underlying liability insurance coverage for the indemnity obligation it assumed under the UTP–Frank's contract, but also that the amount of insurance required in a contract could not exceed $300,000. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 127.005 (Vernon 1986 & Supp.1992). Effective September 1989, this latter provision was modified to permit mutual insurance requirements of any amount. A comment to this amendment provides that "[t]his act applies to an indemnity obligation without regard to whether the obligation was entered into before, on, or after the effective date of this Act." *Id.* comment (Supp.1992).

Relying upon an unpublished district court opinion in *Meche v. Kerr McGee,* CA 86–3678, 1991 WL 162123 (W.D.La.1990), Frank's asserts that the modified act is retroactive for agreements entered into before its effective date, but not to accidents occurring before this date.[19] We do not

---

[18]Under Texas law, indemnity provisions which seek to indemnify parties from the consequences of their own negligence are not violative of public policy and, therefore, they are enforceable. *See, e.g., Delta Eng'g Corp. v. Warren Petroleum, Inc.,* 668 S.W.2d 770, 772 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

[19]In *Meche,* the district court held that:

> [t]he accidents which are the subject of the present case occurred in 1985 and 1986, and the substantive rights of the plaintiffs became fixed at that time. Under Texas law an act effecting substantive rights is presumed to operate prospectively, and any doubt would be resolved against retroactive application of the statute.

reach the merits of Frank's assertion for Frank's procured $10,000,000 in excess insurance and, even under the unamended version of section 127.005 which Frank's relies upon, UTP is entitled to collect indemnity up to the amount of insurance Frank's *actually obtained. See Lirette v. Union Texas Petroleum Corp.,* 467 So.2d 29, 34 (La.App. 4th Cir.1985) (holding that Texas' $300,000 limit on insurance pursuant to indemnity contract did not place an absolute $300,000 limit on each claim where the contractor voluntarily provided more insurance); *see also Maxus Exploration Co. v. Moran Bros.,* 773 S.W.2d 358, 361 (Tex.App.—Dallas 1989) (where indemnification was limited by statute, requiring party to indemnify up to the amount of insurance actually obtained on grounds that "[t]he purpose of the section 4(c) limit is to protect a weaker party from being coerced by a stronger party into providing high indemnity protection"), *aff'd on other grounds,* 817 S.W.2d 50 (Tex.1991). Accordingly, we affirm the district court's determination that Frank's must indemnify for the full amount of the UTP–Frank's agreement.

E. The Gilbert Affidavit

---

> Thus, subsequent amendments to the statute cannot effect the substantive rights affixed thereunder absent clear legislative intent to the contrary. *See* TEX. CONST. ART. 1, § 16; *FSLIC v. T.F. Stone–Liberty Land Ass'n,* 787 S.W.2d 475 (Tex.App.—Dallas 1990); *Ex parte Abel,* 613 S.W.2d 255 (Tex.1981).

> This court agrees that the language in question should not be read as legislative intent requiring retroactive application of the article 127.005 amendments to accidents that occur prior to the effective date of those amendments. The language is more appropriately read as pertaining to those situations where the indemnity agreement was entered into before the effective date, but the accident occurs (or the rights thereunder otherwise become fixed) after the effective date.

UTP and Sonat challenge this holding on Texas policy grounds, asserting that:

> the original purpose underlying the Texas legislature's enactment of the statute limiting indemnity obligations, except where insured, was to prevent inequities being foisted upon oilfield contractors. *See* TEX.REV.CIV.STAT.ANN. art. 2212b, § 1 (Vernon 1973); *see also Maxus Exploration Co. v. Moran Bros.,* 773 S.W.2d 358, 361 (Tex.App.—Dallas 1989), *aff'd on other grounds,* 817 S.W.2d 50 (Tex.1991) (where the court recognized that "the purpose of this § 4(c) limit is to protect the weaker party from being coerced by a stronger party into providing high indemnity protection").

> That policy consideration is simply inapplicable to the instant case because the contract contains a reciprocal indemnity arrangement. No such inequity is being foisted upon Frank's and its contractors....

Defendants also reassert[20] their challenge to the district court's decision to strike the Gilbert affidavit, which defendants submitted in opposition to UTP's Motion for Summary Judgment. According to defendants,

> Judge Scott struck Gilbert's affidavit concluding that it was extrinsic evidence intended to vary the terms of the [UTP–Frank's] purchase order number 86–0806.... [T]his affidavit was not submitted to vary the terms of purchase order number 86–0806, but was rather submitted to show that purchase order 86–0806 (which was post-dated and thus ambiguous), did not apply to the present situation.

> Gilbert's affidavit testimony indicates that Frank's had no intent to indemnify UTP and Sonat.

This is parol evidence and, because the UTP–Frank's purchase order is unambiguous, it is not admissible.[21] *See Jack H. Brown & Co. v. Toys R Us, Inc.,* 906 F.2d 169, 173–74 (5th Cir.1990) (parol evidence is inadmissible "to vary or contradict" the terms of an unambiguously written contract.").[22]

As for defendants' assertion that their purpose for introducing this affidavit was to show that the UTP–Frank's purchase order does not apply to Campbell's injury, we have already addressed this issue. *See supra* Part III.A. In sum, we have found that (1) Frank's admission as to the binding effect of the UTP–Frank's purchase order and (2) the fact that it is common practice between UTP and Frank's for individual purchase orders—purchase orders which have consistently contained the basic indemnity language at issue—to postdate the services rendered remove any ambiguity arising from

---

[20]*See supra* note 5.

[21]We have held that a contract containing an indemnity provision "should be read as [a] whole, and a court should not look beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous." *Fontenot,* 791 F.2d at 1214 (citations omitted). The UTP–Frank's agreement unambiguously requires indemnity, and, in the absence of ambiguity, the district court did not err by refusing to admit the Gilbert affidavit and look beyond the four corners of the UTP–Frank's agreement.

[22]We addressed a similar issue in *Corbitt,* and we held that,

> under federal maritime law, "a court may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous." The district court, therefore, properly refused to consider parol evidence of the parties' intentions and focused solely on the unambiguous language of the Purchase Order.

654 F.2d at 332–33 (citation omitted).

the fact that the purchase order was postdated. Gilbert's affidavit does not shake this finding, and, therefore, it does not create a genuine issue of material fact pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of partial summary judgment in favor of UTP and Sonat and its denial of summary judgment in favor of Frank's and Lloyd's.