**GANZ, Plaintiff,**

v.

**LYONS PARTNERSHIP, L.P., Defendant.**

**No. 3:94–CV–2545P.**

United States District Court,
N.D. Texas,
Dallas Division.

April 10, 1997.

Frank Charles Vecella, Brian Allan Kilpatrick, Jackson & Walker, Dallas, TX, Scott Glenn Camp, Baker & Hostetler, Houston, TX, Annabel Lugo Hoffman, McFall Law Firm, Dallas, TX, Thomas R. Lucchesi, Cleveland, OH, Bruce O. Baumgartner, Baker & Hostetler, Cleveland, OH, for Ganz.

Jerry R. Selinger, Jenkens & Gilchrist, Dallas, TX, Thomas Shawn Leatherbury, Stephen Lloyd Levine, Vinson & Elkins, Dallas, TX, Barry I. Slotnick, Richards & O'Neil, New York City, Jill Bohannon Davenport, Crouch & Hallett, Dallas, TX, Joyce D. Slocum, Richardson, TX, for Lyons Partnership LP.

## MEMORANDUM AND ORDER ON LYONS' MOTIONS FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, OR REMITTUR, ALTERNATIVELY

URBOM, Senior District Judge.

This matter comes before me on the defendant's, Lyons Partnership, L.P., post-trial motions for a judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, a new trial pursuant to Federal Rule of Civil Procedure 59(a)(1), or remittitur, alternatively. Based on my review, I shall deny the defendant's motion for judgment as a matter of law; however, a remittitur is in order with respect to certain unproved damages. Therefore, I shall conditionally grant Lyons' motion for a new trial, solely on the issue of damages related to Baby Bop, in the event the plaintiff, Ganz, does not accept the remittitur.

### BACKGROUND

This case was tried to a jury between August 8 and 19, 1996, in Dallas, Texas. It involves a contract dispute between Ganz, a Canadian toy distributor, which had obtained the right to distribute Barney and Baby Bop "plush" (i.e. "stuffed") toys in Canada from Lyons, a United States limited partnership, which owned the intellectual property rights to these products. In early 1993, Ganz approached Lyons about becoming the Canadian mass-market distributor for Barney and Baby Bop plush.

The parties concur that an agreement between them existed, but dispute its terms. Sometime between March 10 and March 18, 1993, they reached some agreement, for on the latter date, Ganz issued a purchase order for 264,000 toys and Lyons accepted it. Further, Oanz opened a letter of credit payable to Lyons. This purchase order was amended several times to increase the number of toys requested, eventually reaching 720,000 items ordered, and Lyons directed its manufacturer to produce these toys. The letter of credit was also amended as the number of toys increased and, eventually, was replaced with another. A formal, written contract embodying their oral understanding was desired by both parties and they were working toward such a document. However, no final, written contract to which the parties affixed their signatures exists. A "final" draft distribution agreement, to which Lyons now points as the contract, was never signed by either of them.

The parties made a number of claims against one another, but by the time the matter was submitted to the jury, the case had narrowed to the parties' respective breach-of-contract claims. Ganz claimed a breach of contract resulting from Lyons' alleged delay in shipping the products, as well as Lyons' alleged failure in using its "best efforts" in protecting the Canadian toy market from infringements. Because of these failures, Ganz claimed it was left with 174,000 unsold toys upon which it lost profits. It likewise claimed lost profits on an additional 204,000 toys on which it did not take delivery. Both of Ganz' breach of contract claims rested on the existence of an oral and written contract entered into by the parties in March 1993. Lyons counterclaimed that Ganz had failed to take delivery of and pay for 204,000 plush toys on which it was obligated under the parties' agreement. The jury returned its verdict on August 20, 1996. It found that Lyons had breached its agreement with Ganz because of delays in delivery of the toys under the March purchase order. It award-

ed Ganz damages in the amount of $2,255,935 for this breach. The jury also found for Ganz on its failure to protect the market claim and awarded $1,565,333 in damages. Finally, the jury found against Lyons on its counterclaim.

## STANDARD OF REVIEW

A motion for judgment as a matter of law, made pursuant to Federal Rule 50(b), should be granted only when, after considering all of the evidence presented by the parties and all reasonable inferences arising therefrom in a light most favorable to the non-moving party, the court finds that the facts and inferences point so strongly in favor of one party that reasonable persons could not arrive at a contrary verdict. *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 705 (5th Cir.1997) (citing *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc)); *Resolution Trust Corp. v. Cramer*, 6 F.3d 1102, 1109 (5th Cir.1993). Only those grounds raised in a pre-verdict motion for judgment as a matter of law, made pursuant to Rule 50(a), may be heard in a post-verdict Rule 50(b) motion. *See, e.g., Kutner Buick, Inc. v. American Motors Corp.*, 868 F.2d 614 (3d Cir.1989).[1]

■ Federal Rule of Civil Procedure 59(a) provides that "[a] new trial may be granted to all or any parties and on all or part of the issues ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States ..." FED. R. CIV. P. 59(a). *See* 6A MOORE'S FEDERAL PRACTICE. ¶ 59.08 (1996) for a list of reasons. Granting a motion for a new trial, timely filed, is within the sound discretion of the trial court. *See, Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940); *Smith v. Transworld Drilling Co.*, 773 F.2d 610 (5th Cir.1985). The Fifth Circuit has explained that "[w]e require that new trials should not be granted on evidentiary grounds [(as Lyons argues in this

1. As relevant, in its motion made at trial, Lyons asserted that it was entitled to judgment because: there was no evidence of delay, Ganz failed to give notice of the breach, Ganz was not damaged by any delay, its damage amounts were specula-
tive, Ganz failed to mitigate its damages, and Ganz failed to demonstrate that the "knock-offs," to which it attributed its damages, were impermissible infringements.

case) ] 'unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence.' " *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982) (quoting *Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360, 362 (5th Cir.1980)).

■ Lastly, under Texas law, a remittitur of damages is warranted where the jury's verdict is not sufficiently supported by the evidence so that it would be "manifestly unjust" to uphold the damage award. *K Mart Corp. v. Rhyne*, 932 S.W.2d 140, 145 (Tex. App.1996) (*no writ*) (citing *Pope v, Moore*, 711 S.W.2d 622, 623–24 (Tex.1986)); *Larson v. Cactus Utility Co.*, 730 S.W.2d 640, 641 (Tex.1987), *reh'g denied* June 17, 1987.

### DISCUSSION

■ Before I address Lyons' claims, I first consider the question of whether the jury could reasonably conclude that time was of the essence under the parties' agreement. "The general rule is that time is not of the essence in a contract unless the parties expressly make it so, or there is something in the nature or purpose of the contract and the circumstances surrounding it which make it apparent that the parties intended that time be of the essence." *Siderius, Inc. v. Wallace Co.*, 583 S.W.2d 852, 863 (Tex.Civ.App.1979) (*no writ*) (citations omitted). It is a question for the jury unless the contract expressly makes time of the essence, or the subject matter of the contract is such that the court may take judicial notice of the fact that the parties obviously intended for time to be of the essence. *Lockhart–Hutchens v. Bergstrom*, 434 S.W.2d 453, 456 (Tex.Civ.App. 1968) (*ref'd n.r.e.*). I find that there was sufficient evidence from which the jury could conclude that time was of the essence.

■ Ganz employees made it clear to Lyons representatives during discussions in February and early March that time was a critical factor in selling Barney in Canada. (S. Ganz depo. at 18–21; H. Ganz, 1:122–24, 139–40, 144–45, 149–50, 180–81; Pl.'s Exs. 55, 57). Further, this was reiterated in the March 18, 1993, purchase order, (Pl.'s Ex. 3), which stated: "TO COMMENCE A.S.A.P. PREFERABLY NO LATER THAN APRIL." next to the shipping date. It was again stressed in an April 1, 1993, memorandum, (Pl.'s Ex. 62), from Debby Chan, a Ganz employee, to Judy Bennett, a Lyons employee. It read: "[i]t is very **important** that the shipping schedule faxed to us by Gail (copy attached) will be complied with as we are making commitments to our customers based on this." (Pl.'s Ex. 62) (emphasis in original) Attached to the memorandum was the shipping schedule for the initial 264,000 toys. The schedule was supplied by Lyons to Ganz. It provided that the last shipping date from Indonesia for any portion of the toys which were part of this order would be May 15, 1993.

■ A letter of credit, no. 1026258, covering this order was opened by Ganz on March 25, 1993. Lyons argues that in amending this letter of credit on June 3, 1993, to provide for a different latest shipping date of July 10, 1993, Ganz also amended the original purchase order's shipping date to July 10, 1993. Because it complied with this revised date, Lyons contends, it did not breach the contract. (Def.'s Br. at 8 n. 5, 14–15 citing *Siderius, Inc. v. Wallace Co.*, 583 S.W.2d 852, 864 (Tex.Civ.App.1979) (*no writ*)). Ganz counters that the jury could find from the evidence that amending the letter of credit did not amend the parties' understanding that time was of the essence or the shipping date for the original order of 264,000 items, both part of the underlying oral agreement. I agree.

■ The central principle behind letters of credit is the "independence principle," whereby they are recognized to be separate and distinct contracts from the underlying contract of sale. International Chamber of Commerce, UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (UCP) art. 3, I.C.C. Publication No. 400 (1983 Revision) (letters of credit, "by their nature, are separate transactions from the sales or other contract(s) on which they may be based ..."); UCP art. 4; UNIFORM COMMERCIAL CODE (UCC) § 5–103(d) ("Rights and obligations of an issuer to a beneficiary ... under a letter of credit are independent of the existence, performance, or non-perfor-

mance of a contract or arrangement out of which the letter of credit arises or which underlies it ..."); UCC § 5–108(f); *RTC v. Kimball,* 963 F.2d 820, 822 (5th Cir.1992) (applying Texas law) ("[A] fundamental characteristic of the structure of the letter of credit transaction is that the ... contractual relationships created thereby are separate and independent."); *Republic Nat'l Bank v. Northwest Nat'l Bank,* 578 S.W.2d 109, 112 (Tex.1978). The financial institution upon which the credit is drawn must honor it only according to its terms; that is, upon timely presentation of the properly completed documents requested in the letter, the institution must pay the beneficiary, whether or not the contract for sale for which the letter has been opened is performed. The contract embodied in the letter is not controlled by the underlying performance of the contract for sale. Because of that, logically then also, the underlying contract should not be governed by the letter of credit transaction, unless there is evidence that the letter's amendment was intended to amend the contract for sale. *See MYGSA, S.A. DE C.V. v. Howard Indus., Inc.,* 879 F.Supp. 624 (S.D.Miss.1995) (reaching similar conclusion).[2] Where the contract is ambiguous, the parties' intention is relevant, and the question as to what was intended is for the jury. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 886 S.W.2d 294, 301 (Tex.App.1994); *Phillips v. Parrish,* 814 S.W.2d 501, 503 (Tex.App. 1991) *(writ denied ).* In light of this, and the evidence already noted above, the jury could

conclude that the parties did not intend that the amendment to the shipping date of the letter of credit affected the date of the contract for sale. Further, because the evidence showed that Ganz did not receive the toys from its March order according to the original shipping schedule, the jury could reasonably conclude that there was a delay in shipment.

### Count I—Breach of Contract (Delay )

Lyons contends that it is entitled to judgment as a matter. of law on Ganz' claim for breach of contract due to delay for a number of reasons. First, it argues that language in the parties' Distribution Agreement plainly precludes Lyons' liability "arising from delays in delivery · or failure to deliver any Merchandise." The Agreement is relevant and controlling, Lyons argues, because two factual statements contained in Ganz' amended complaint, amount to judicial admissions, thereby barring Ganz from asserting any claim for delay. Incidental to this, Lyons also contends that there was no delay in delivery in any case.[3] Second, Lyons argues that Ganz failed to produce evidence that any delay in delivery caused Ganz harm. This lack of causation, Lyons asserts, is fatal to Ganz' delay claim. Third, it challenges Ganz's evidence of damages resulting from any alleged delay as speculative. Finally, the defendant claims that Ganz failed to provide it adequate notice of breach resulting from delay. In the alternative, Lyons sug-

**2.** Furthermore, Lyons' reliance on *Siderius,* 583 S.W.2d at 864, for its contention that, as a matter of law, when Ganz amended the letter of credit on June 3, 1993, it also extended the shipping date on the original purchase order, is misplaced. In *Siderius,* Wallace opened a letter of credit on behalf of Siderius, a company from which Wallace wished to purchase steel pipe. Its purchase order *expressly stated* that it was based on the letter of credit as did Siderius' sales confirmation. *Id.,* at 856. The letter of credit was amended five times, including changes to the agreed shipping date. The *parties did not dispute* that they had agreed to change the date by which the goods had to be loaded on board ship to the date in the amended letter of credit. *Id.,* at 864. There is no statement by the appellate court in *Siderius* that, as a matter of law, a change in the shipping date of the letter of credit amends the date of the contract for sale. The closest statement to such a position is the court's

sentence that "[i]t is undisputed that the original shipping deadline, as agreed upon in the purchase order and sales confirmation, was extended by a subsequent agreement of the parties, evidenced by the amendment to the letter of credit." *Id.* In light of the court's language, the parties' apparent agreement that the date was modified, and the fact that the documents evidencing the underlying sales contract showed they were expressly based on the letter of credit, I cannot conclude every amendment of a credit is an amendment of the sales contract. Further, I have not found that such a conclusion is required by either Texas' Business and Commerce Code or the I.C.C.'s Uniform Custom and Practices for Documentary Credits.

**3.** Lyons claim in this regard has already been addressed above in considering the issue of whether time was of the essence.

gests it is entitled to a new trial on this claim or a remittitur on the jury's damage award.

▋ Lyons points to language found in Section 4 of the Distribution Agreement as barring Ganz' claim for delay. The relevant portion reads:

> ... Lyons shall use reasonable efforts to fill such order by the specified delivery date; *provided, however,* nothing contained in this Agreement shall be construed as a guarantee of delivery and Lyons shall be under no liability (however arising to the Distributor) arising from the delay in delivery or failure to deliver any Merchandise.

(Def.'s Ex. 1, Att. A at 5 (emphasis in original).) The factual assertions made in the pleadings state:

> 14. In accordance with the parties' agreement (which was later reduced to writing, but was not signed) Ganz paid Lyons a fixed price of $8.00 per item for the Barney plush toys ...

> 15. In December 1993, the parties' discussions over Ganz' distributorship culminated in a final draft of a "Distribution Agreement." A copy of the Distribution Agreement ("Agreement") is attached hereto as Exhibit A.

(Def.'s Ex. 1, ¶¶ 14, 15.) Lyons claims that in these paragraphs Ganz judicially admitted that the Distribution Agreement "reflected the parties' agreement" and, as a result, may not make any claim for delay. For this proposition it cites *Campbell v. Sonat Offshore Drilling, Inc.,* 979 F.2d 1115, 1119 (5th Cir.1992), which states that " 'factual assertions in pleadings are judicial admissions *conclusively* binding on the party that made them.' " *Id.* (citing *Davis v. A.G. Edwards & Sons, Inc.,* 823 F.2d 105, 108 (5th Cir.1987) (emphasis added), *quoting White v.*

*ARCO/Polymers, Inc.,* 720 F.2d 1391, 1396 (5th Cir.1983)).

▋ Near the beginning of trial, I ruled that the statements taken from the plaintiff's pleadings, above, are not judicial admissions but are only adverse evidentiary admissions. I remain convinced that they are such. As this court recognizes, "the pretrial order supersedes all prior pleadings, serving, in effect, as the operative answer and complaint in the case." *Hall Dadeland Towers Assocs. v. Hardeman,* 736 F.Supp. 1422, 1433 n. 10 (N.D.Tex.1990) (quoting *U.S. v. Texas,* 523 F.Supp. 703, 720 (E.D.Tex.1981) and *Morales v. Turman,* 535 F.2d 864, 867 n. 7 (5th Cir. 1976), *rev'd on other grounds,* 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977)). Because the pretrial order does not show that Ganz' claims rested solely upon the unsigned Distribution Agreement, (*see* Joint Pretrial Order at 4–5 stating "[a]lthough the parties never executed the draft distributorship agreement, this agreement is *evidenced by the writings of the parties, their conduct and Lyons' admissions* under oath as to the existence of the relationship and its essential terms ..." (emphasis added)), the factual statements made in its amended complaint should be considered evidence to be weighed by the jury along with other evidence submitted by the parties. That is exactly what was done. Moreover, these factual assertions are not unambiguous statements in and of themselves. In addition, the manner of this case's progression does not suggest to me that the plaintiff based its case on the terms of the unsigned document. In fact, it seems to me that it proceeded on the theory that more than a single document or action composed the parties' agreement and that the unsigned distribution agreement was not the binding document. For these reasons, I consider Lyons' contention to be without merit.[4]

---

4. *Campbell,* the case cited above by Lyons, involved a personal injury action by an offshore oil drilling worker against Union Texas Petroleum (UTP) and Sonat Offshore Drilling (Sonat). Campbell was injured when he was transferring from one defendant's vessel to the other's. At the time of his injury, he was working for Frank's Casing Crew and Rental Tools, Inc. (Frank's), which had been hired by UTP. *Campbell,* 979 F.2d at 1117–18. Shortly after UTP was sued by Campbell, it brought a third-party complaint against Frank's for defense and indemnification, claiming the existence of such a contract with Frank's at the time of the accident. Frank's admitted in its third-party answer that a written contract did exist between it and UTP. *Id.* at 1119 ("there exists between [Frank's] and [UTP] a contract, which contract being a written instrument is the best evidence of its terms and conditions ..."). The contract was in the form of a purchase order signed thirteen days after

Lyons argues that Ganz failed to produce evidence that any delay in delivery *caused* Ganz harm. It argues that because Ganz sold the 264,000 toys ordered in the March purchase order at its requested price, it was not injured. (Def.'s Br. at 10.) This misses the point of Ganz' damage claim. Ganz' theory of damages resulting from the alleged delay in delivery was that the delay created a window in the Canadian Barney-market, permitting imitation or illegitimate Barney products to gain a foothold. The result was that Ganz lost sales in May and June, as well as future orders it would have had, absent any delay, because the imitation Barneys satisfied, at least, some of the demand. It claims that it was left with an inventory of 174,000 toys as a result; these toys indeed coming from its later orders, as Lyons contends, as opposed to the original 264,000. It was forced to sell these at a substantial discount to Kay Bee Toys. In addition, Ganz claims that it could have sold the additional 204,000 items on which it did not take delivery, toys again that Ganz had ordered after its original purchase order. In its claim for damages on this breach of contract claim, Ganz requested, therefore, that it be compensated for its lost profits on all these items.

Lost profits can be recovered if they are the natural and probable consequences of wrongful conduct. *Pena v. Ludwig,* 766 S.W.2d 298, 304 (Tex.App.1989) (*writ requested*). A party seeking lost profits must prove those profits by competent evidence with reasonable certainty. *Ishin Speed Sport, Inc. v. Rutherford,* 933 S.W.2d 343, 350 (Tex.App.1996) (*no writ*) (citing *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992)); *Southwest Battery*

*Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097 (1938). The party must also prove that the damages it suffered were caused by the other party's conduct. *Doe v. Boys Clubs of Greater Dallas,* 907 S.W.2d 472, 477–78 (Tex. 1995); *McKnight v. Hill & Hill Exterminators, Inc.,* 689 S.W.2d 206, 209 (Tex.1985). Lyons contends that Ganz has failed to do this.

The trial transcript shows that evidence was elicited on the size of the market for Barney toys in Canada and the number of sales Ganz could anticipate. (S. Ganz depo. at 108–12; Slotje VII:125–32; Cameron, III: 39, 68–69 (projected Woolco purchases); Reive, IV: 177–80 (Projected Buyway purchases); Def's Exs. 10 & 21.) The evidence varied. In Sam Ganz' written notes of the February meeting between the parties, (Def's Ex. 21), he estimated 275,000 items. In his videotaped deposition he estimated the total sales at 720,000. (S. Ganz depo. at 110.) Mike Richards, Sales Manager of Ganz' Toy Division, made a preliminary projection of 315,000. (Richards, IV: 28.) Daniel Slotje, an economist and professor at Southern Methodist University and Lyons' expert, testified that it would be less than 420,000. (Slotje, VII: 129–30.) Ganz sold approximately 340,000 toys in Canada. The jury had before it much evidence from which to make its decision. It could weigh that evidence, as well as make credibility determinations based on the witnesses' behavior.

For example, it could weigh Slotje's testimony as to the number of potential Barney purchasers. He began his calculations by including all children less than five years old. In 1993, this number was 2,013,900. (Slotje, VII: 127.) Because, however, not all of

---

Campbell's accident. On a motion for partial summary judgment the court found in favor of UTP and Sonat on this issue. Frank's appealed.

The Fifth Circuit, citing the quoted language above, affirmed the existence of the contract. However, *it did not rely solely* on Frank's admission in its third-party pleading. It also relied on other evidence to confirm the existence of the contract. *Campbell,* 979 F.2d at 1119–20 ("Moreover, our reliance on Frank's original response to UTP's assertion that a contract was in force at the time of Campbell's accident is buttressed by evidence that . . .") (citing four pieces of evidence in support of its conclusion). The

case before me has not proceeded along lines that show that Ganz has based its claims on the unsigned distribution agreement; rather, there is no written document which definitively includes all the alleged terms of the parties' agreement. Moreover, the suggested admissions are not definitive in the same way they are in Campbell and even in that instance, the court did not solely rely on the pleadings, but looked to the facts proved by the evidence. For all of these reasons and because it is unclear what role the final pretrial order played in Campbell, I remain convinced that my decision at the time of trial was correct.

these spoke English or had access to Barney's television show, he reduced the figure for such children to approximately 1,000,000. (Slotje, VII: 127–29.) However, he concluded that the market group for Barney was only two- and three-year-olds, which brought that figure down to 420,000. Yet, there was testimony that Barney's popularity and demand might extend to children who were up to eight years old. (Craddock, V:121.) Slotje had not considered that possibility. Further, Slotje's determination that the market was only two- and three-year-olds, was contrary to Lyons' position that the interested age group extended beyond five years old. (Slotje, VII: 165.) Because Ganz' had between 80–90% of the toy market in Canada, the aforementioned evidence could permit the jury to reasonably conclude that 720,000 toys was not excessive. In addition, the jury could discount Slotje's claim that, because the Canadian economy was in recession at this time, demand for plush toys might also decrease. Ganz offered Craddock's testimony, based on his experience in the Canadian toy industry, that bad economic conditions did not necessarily result in decreases in demand for children's toys. (Craddock, V:88–89.) Also, Slotje's testimony that other plush toys competed with Barney during 1993 was challenged by the testimony of other witnesses who stated that the toys cited by him either were unavailable in Canada at that time, were on their way out, or had not yet begun to rise in popularity until late 1993. (Cameron, III: 71–74.) Thus, this case involved a classic example of weighing the credibility of the witnesses offered by the litigants. Where the evidence and all reasonable inferences arising therefrom could support the jury's verdict, the court will not substitute its judgment for that of the finder of fact.

Because Ganz' claim for delay also relies on the existence of competitive Barney-like products gaining a foothold in Canada before the legitimate products could make their appearance, Ganz must establish that these items were present during May and June. Such testimony was offered. Bill Reive, the purchaser for Buyway [sic], a Canadian retail store chain, stated he purchased the competitive Barney products because the legitimate Barney were not available. (Reive, IV: 197–98.) He purchased approximately 59,000 competitive Barney-like plush toys between April and December 1993 and that these Barney-like toys were present in March and April. (See Reive, IV: 174, 176, 181, 183.) He also testified that he anticipated selling between 60,000 and 70,000 legitimate Barneys in 1993. (Id. 180). The total order he placed with Ganz, however, amounted to only 24,000 toys, of which he eventually canceled 6000 items due to the competitive products filling the market. (Reive, IV: 182). In addition, Cameron testified that in his personal experience, there was no competition to Barney. "It was ... a league unto its own," (Cameron, III: 70:24.) and "The only competitive item to Barney was the knockoff Barneys." (Id., 77). He ordered 38,000 Barneys from Ganz, projecting total sales through the Woolco chain of stores in the range of 100,000 pieces. (Id., 76) He did not reorder, however, because sales fell in September. Ganz' expert testified that there was a one-for-one correlation between the sale of a Barney-like product and a Barney item and that had the Barney-like toys not been present in the market, Ganz could have sold all of the additional toys it ordered. (Craddock, V: 57–61, 58–59; H. Ganz, II: 58.) He stated that "Ganz lost hundreds and hundreds and hundreds of thousands of sales and pieces and maybe more." (Craddock, V: 59.) The jury had this testimony to weigh against Lyons' expert's testimony that it would be unreasonable to suggest a one-for-one relationship between sales of the competitive Barneys and authentic Barney because, *inter alia,* the price elasticity of demand for Barney and the poor Canadian economy. (Slotje, VII: 136–37, 173; Def's Ex. 10.) Again, the jury was entitled to weigh the evidence.[5]

---

5. Lyons cites *BAW Mfg. Co. v. Slaks Fifth Ave., Ltd.,* 547 F.2d 928, 931 (5th Cir.1977) for the proposition that Ganz may not recover damages for delay, because it sold all of the original 264,-000 toys allegedly delayed in delivery. In *Slaks,* a retailer's claim for defective assembly work was dismissed on summary judgment because, according to Lyons, the retailer sold the allegedly defective goods. The Fifth Circuit's statement dismissing the claim is ambiguous, however. It

Lyons next challenges Ganz's evidence of damages (lost profits) as speculative. As noted above, damages must be proved by competent evidence with reasonable certainty. *Ishin Speed Sport,* 933 S.W.2d at 350 (citation omitted). "This means that, at a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of the lost profits can be ascertained." *Id.* The calculation of Ganz' damages was done by Owen Rogers, Ganz' Vice President of Finance and Administration. Rogers was not identified or offered as an expert; he gave his testimony as a lay person pursuant to Federal Rule of Evidence 701, based on his personal knowledge and perception of the facts and data on which his calculations are based.[6] In response, Lyons offered an expert, under Rule 702, Daniel Slotje, on the damages suffered by Ganz.

Rogers testified that Ganz would have cleared C$7.54[7] on each of the 174,000 toys it had received but failed to sell in Canada, and a like amount on each of the 204,000 items on which it never took delivery. (Rogers, V:188–200; 193; 199; Pl.'s Exs. 122, 124, 125, 126 & 167.) Rogers considered the costs incurred by Ganz in manufacturing and shipping the merchandise to Canada and the costs incurred in the disposition of the inventory. He subtracted from this amount the revenue Ganz earned from its eventual sale of the 174,000 pieces in inventory to Kay Bee Toys. This amounted to $1,300,582. He then calculated the lost profit on these toys as $955,353. He then considered the lost profit on the 204,000 items Ganz never received. This totaled $1,120,070. Finally, he calculated the interest that would have been earned on the lost profits from the sale of the toys had those funds been available to be invested for the period beginning January 1, 1994, and ending August 1, 1996. That figure was $294,883. Rogers also calculated the amount of money that would have been earned on the losses resulting from the disposition of the inventory had those losses had not been incurred. That figure was $150,380. As noted above, the jury found for Ganz on Count I (delay) in the amount of $2,255,935 and on Count II (infringement) in the amount of $1,565,333.

In his report, Lyons' expert concluded that Ganz' profit per item estimate was speculative and was not established to a reasonable degree of certainty. (Slotje Rep't, Def.'s Ex. 10.) In the report itself, Slotje discussed the implication of earlier profit-per-toy calcula-

stated that summary judgment was proper because Slaks "sold all of the allegedly defective garments *and, so far as the record shows, suffered no damage." Id.* (emphasis added). I cannot tell what Slaks' claim was for. If, for example, it was for defective manufacture, but it sold the offending items without any loss in profit to itself, perhaps summary judgment was proper, because it was in the position it would have been in (*i.e.* selling the items without a loss) had the contract been performed without a breach (*i.e.* without the defective workmanship). *See, e.g., Pletz v. Christian Herald Ass'n., Inc.,* 486 F.2d 94, 97 (5th Cir.1973) (party to a contract is entitled to be placed in the position he would have been in had the contract been performed) (applying Texas law). If Slaks' claim was for lost future sales on additional items, the court may have affirmed the summary dismissal because Sinks failed to prove such losses. In the instant case, Ganz asserted lost profits on future sales of toys. Provided these are causally tied to the late delivery of the original Barneys, such lost profits are a part of consequential damages, and within those damages available under contract recovery.

6. Lyons asserts that the court erred in permitting Rogers to testify to his unsupported lay opinions, because it was the same testimony Ganz sought to admit through John Siegel's rebuttal report and that had been struck by Judge Solis in January 1996, "as untimely and beyond the scope of rebuttal testimony." (Def.'s Br. at 11 n. 6.) Judge Solis struck this testimony as exceeding the realm of rebuttal testimony because the damages testimony offered by Lyons did not challenge Ganz' theory and, as a result, Ganz had no need to offer rebuttal on this subject. Judge Solis' order does not preclude this testimony from Ganz' case-in-chief, as Rogers performed these calculations in his role as vice-president of the company and with personal knowledge of the facts and data. He was properly designated as a fact witness before trial and could testify as to his opinion of the damages suffered by Ganz due to Lyons' alleged misconduct. In its motion, Lyons also argues that the court committed other trial errors. Because it has failed to identify and brief them, this claim is without merit. For like reason, its claim that the court erred in denying its motion for summary judgment is also meritless.

7. "CS" designates money in Canadian currency. There is a conversion rate of approximately C$1.374 to US$1.00. Where "$" appears, the figure is in United States currency.

tions in which Ganz concluded it would make C$3.11 and C$5.38 per item. (*Id* at Executive Summary, 1–2, 17–18.) Lyons even offered into evidence Rogers' earlier calculation of lost profits based on a profit of only C$3.11 per Barney. (Def.'s Ex. 11.) He also testified, as mentioned above, that it would be unreasonable to conclude that each sale of a lower priced Barney-like plush toy would mean the loss of one sale of Ganz' authentic Barney, especially in light of the many other factors at work in the Canadian economy. (Slotje, VII: 133–34.) I cannot conclude that merely because the jury chose to believe the highest calculation of damages offered by Ganz, it was unreasonable to do so. There was sufficient evidence from which the jury might reach its verdict, even in the face of the evidence offered by Lyons.

■ Lyons also contends that Rogers' calculations were of "marginal" profit as opposed to net profit, the latter being the proper measure of damages in breach-of-contract actions for lost future profits. (Def.'s Reply Br. 3–4 citing *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex.App.1988) (*writ denied*)). While this states the general rule, Lyons' contention is without merit in this instance. Net profit is defined as "what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business." *Turner*, 765 S.W.2d at 465. There was testimony that Ganz had already met its costs of overhead from sales or income already earned in 1993. (Rogers, V:59–60.) Therefore, in calculating the marginal profit on the Barney merchandise, it was Ganz' position that those expenses need not be included because they had already been met. (Rogers, V:59–60.) As already mentioned, the report of Lyons' expert included his opinion that Ganz' damage claims were unreasonable and speculative. (Def.'s Ex. 10 at Exec. Summary, 1–2, 17–18.) Thus, the jury had before it sufficient evidence that it could weigh in making a decision on the amount of damages actually suffered.

■ Finally, the defendant claims that Ganz failed to provide adequate notice of a breach arising from any delay. (Def.'s Br. at 12–14.) Section 2.607(c)(1) of the Texas Business and Commerce Code states that "[w]here tender has been accepted the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy ..." TEX. BUS. & COM. CODE ANN. § 2.607. Lyons asserts that under this provision "specific" language needs to be used that the buyer "considers the delay a breach and intends to pursue remedies for the untimely delivery." (Lyons' Br. at 12.) This is not the case. The notice requirements under Section 2.607 are liberally construed. *Reynolds Metals Co. v. Westinghouse Elec., Corp.*, 758 F.2d 1073, 1078 (5th Cir.1985) (citing *Vintage Homes, Inc. v. Coldiron*, 585 S.W.2d 886, 889 (Tex.Civ.App.1979) (*no writ*). *See also, Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 976 (5th Cir. 1976) ("... notice under section 2–607 need not be a specific claim for damages or an assertion of legal rights.") (citation omitted)); TEX. BUS. & COM. CODE ANN. § 2.607 cmt. 4 ("Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy."). This is not to say, however, that any expression of discontent satisfies Section 2.607. As Comment 4 to Section 2.607 states, the notification must "be sufficient to let the seller know that the transaction is still troublesome and must be watched" and, at the same time, "be such as informs the seller that the transaction is claimed to involve a breach and thus open[ ] the way for normal settlement through negotiation." TEX. BUS. & COM. CODE ANN. § 2.607 cmt. 4. The notice given, where the buyer is a merchant, must be judged by "reasonable commercial standards of fair dealing in the trade." *Eastern Air Lines, Inc.*, 532 F.2d at 977; *Reynolds Metals Co.*, 758 F.2d at 1078 (citing *Vintage Homes*, 585 S.W.2d at 889) ("The question of the adequacy of such notice depends on the reasonableness of the efforts by the wronged party to communicate his dissatisfaction with the tendered performance, considering all the circumstances.").

■ Beginning in April, Ganz officials discussed with Lyons the delays in shipment. Sam Ganz testified that on many occasions during the period when delivery of the first

order was being made in partial shipments, he contacted Lyons to complain about their lateness. (S. Ganz depo. at 90.) On April 28, 1993, Sam Ganz wrote to Lyons' Vice President for Finance, John Green, indicating the need to follow the shipping schedule Lyons had supplied earlier and because legitimate Barney was not present in Canada due to "indecisiveness associated with this project . . . infringements were accommodating the marketplace." (Pl.'s Ex. 72.) Again on June 2, 1993, at a meeting attended by Sam and Howard Ganz and representatives of Lyons, the shipping delay was addressed. (S. Ganz depo. at 48; H. Ganz, 11:6–7.) Against the backdrop of the repeated statements by Ganz that early delivery for sale in the Canadian market was essential, the jury could reasonably conclude that Ganz' actions were sufficient notice that the delay in shipment was not satisfactory. From the evidence, the jury could conclude that the underlying purposes of Section 2.607 were accomplished: Lyons was made aware that Ganz was dissatisfied with the shipping schedule and the parties could negotiate a settlement. *Kern Oil & Refining Co. v. Tenneco Oil Co.*, 840 F.2d 730, 737 (9th Cir.1988), *cert. denied*, 488 U.S. 948, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988) (applying Texas law).

■ Lyons also points to Ganz' June 2, 1993, purchase order, in which Ganz ordered additional toys even though it was aware that the first order was not shipped according to the dates of the original shipping schedule. (Def.'s Br. at 13.) No communication surrounding this order indicated that Ganz considered the delay a breach, Lyons contends. It also argues that Ganz' subsequent conduct in seeking an agreement for the Canadian gift market waived or excused the alleged breach. It is possible that subsequent conduct may dissipate the effect of an earlier expression of dissatisfaction or notice of breach. *Eastern Air Lines, Inc.*, 532 F.2d at 978. However, in this instance it was not unreasonable for the jury to conclude that these subsequent actions did not affect Ganz's earlier statements of dissatisfaction. Lyons was the only entity with the rights to Barney and, therefore, permitted to enter into contracts for the distribution of authentic merchandise. Further, it was the only

entity with access to the manufacturer of authorized Barney toys. Ganz could not seek an alternate source for the legitimate product. As the court in *Kern* noted, where parties are wedded together because of circumstance, "we should not expect a married party to complain as loudly as one who is free to play the field." *Kern Oil & Refining Co.*, 840 F.2d at 737 n. 8. The jury was instructed that it could consider the circumstances in determining whether these actions did or did not waive Ganz' expressions of dissatisfaction. (Final Instrs. at 3.)

■ With respect to Lyons' claim for a new trial or remittitur, I do conclude that the evidence does not support the jury's finding that delay caused Ganz' losses with respect to Baby Bop. Because Ganz' claim is that Lyons' delay in shipping the initial order permitted unauthorized Barney toys to enter the market, Ganz must establish that such knock-offs were present in the market during the period before the legitimate items arrived. It has not done so with respect to Baby Bop. It was not until November 1993 that Baby Bop knock-offs were first seen in Canada, according to Ganz. (Pl.'s Ex. 43.) There was no evidence that they appeared any earlier. In addition, the plaintiff failed to put on any evidence showing the number of Baby Bop knock-offs present in the Canadian market after November or that these took sales away from authentic Baby Bop. For these reasons, the jury's award of damages on Count I, which included amounts for the Baby Bop character, is without sufficient basis and must be reduced. Of Ganz' unsold inventory purchased by Kay Bee Toys, 13.16% were Baby Bop plush toys. (Pl.'s Ex. 115.) A reduction in both the losses incurred on the disposition and the lost profits due on these toys in a like percentage is appropriate. Because the jury awarded damages only related to the 174,000 unsold toys under Count I, the amount of the award can be directly reduced by 13.16%, to $1,959,054.00. I shall order remittitur in the above amount on this claim and conditionally grant Lyons' motion for a new trial solely on the issue of damages, should Ganz refuse.

### Count II—Breach of Contract
### (Infringement)

Lyons argues three propositions with respect to Ganz' breach of contract claim for Lyons' alleged failure to protect the market from infringing products. It first contends that there is no evidence that Lyons promised to use its best efforts to protect the market against infringements. Second, Lyons asserts that the plaintiff failed to prove the existence of any infringements in the Canadian market. It states that Ganz showed neither copyright nor trade dress infringement on the part of any of the competing Barneys. Finally, it asserts that Ganz failed to show that it lost any sales to "legally" infringing toys as opposed to non-infringing, competitive purple "dinosaurs." Lyons bases its alternative motion for a new trial on this claim on these same grounds, as well as on Ganz' alleged failure to mitigate its damages.

■ Ganz' expert on the toy market in Canada, Barry Craddock, testified that it is generally understood in the toy industry that "a knock-off is an unauthorized copy of a copyrighted product" and an infringement is understood to be "specially [sic] the same thing. . . . An infringement is an unauthorized copy of a protected product." (Craddock, V: 47.) He also testified that it need not be an exact copy of the legitimate product. (Id.) While the word "infringement" can have a legal connotation, Craddock's testimony that it has a broader meaning in the Canadian toy industry reasonably permitted the jurors to conclude that the parties used it in a different manner from its legal definition. Craddock testified that he personally witnessed the competing Barney knock-offs in stores in Canada. (Id. at 47–48.) There was other testimony, already mentioned above, that such knock-offs were present in the market and were purchased by Ganz' customers. In addition, Craddock testified that the problem with Barney knock-offs was the worst he had ever seen and he concluded, based on his observations and experience in the industry, that there were hundreds of thousands of such knock-offs in the Canadian market. (Id. at 49, 59.) As mentioned above, he also stated he believed that a one-for-one relationship existed between sales of the knock-offs and decreased sales of Ganz product. (Id. at 57–59.)

■ There was also ample evidence, which, if the jury chose to credit it, supported Ganz' claim that Lyons promised to protect the market from infringements. There was testimony by Howard and Sam Ganz. Moreover, there were multiple letters sent by Ganz to Lyons asking it to take action against the knock-offs appearing in the Canadian market. (See Pl.'s Exs. 30, 32, 35–39, & 41–44.) Further, there was evidence that Lyons employees sent several letters to infringers. (Stormer, V: 137–38, 159.) Craddock also testified that it was the practice in the toy industry for the owner of the intellectual property rights of a particular product to take action against knock-offs. (Craddock, V: 61–63.) The jury might also reasonably infer from the four lawsuits initiated by Lyons against competitive knock-off Barney toys near the end of 1993 that Lyons had promised to act on Ganz' behalf. (Def.'s Exs. 104, 105, 106 & 107.) In addition, the unsigned, draft distribution agreement, while not expressing Lyons' alleged obligation in exactly the same terms, suggests that the parties agreed that Lyons had responsibility to protect the property rights associated with Barney. The jury could rely on all of this evidence to reach the conclusion that Lyons did promise to use its best efforts to see that infringing products not supplant the legitimate Barney.

■ Lyons argues that it is entitled to a new trial on this claim because Ganz failed to mitigate its damages with respect to its infringement claim as shown by Ganz' failure to contact Lyons' higher management when Ganz realized no action was being taken to combat the knock-offs, to use its long-standing relationships with its customers to minimize their purchase of knock-offs before the legitimate product arrived, to seek permission to sue the alleged infringers itself, and to reduce its wholesale price even after it knew it should. (Def.'s Br. at 25–26.) For each of these reasons, Lyons claims, Ganz has been shown to have failed to exercise the appropriate degree of care in handling its

business affairs as would the ordinarily prudent person under the circumstances.

Craddock testified that the practice in the toy industry was that the owner of the intellectual property rights to a toy takes action against knock-offs and it was not the distributor's role to police the market. (Craddock, V: 61–63.) He further stated that Ganz could reasonably rely on Lyons' promise to take action to protect the market and that in the trade, part of the purchase price paid by a distributor is for such action by the property owner. (*Id.* at 121–22; see H. Ganz, I: 125–26.) Ganz repeatedly sent examples of the alleged knock-offs it found in the Canadian market to the designated Lyons' employees and this information was sufficient to alert Lyons and permit it to take action. (Craddock, V: 71–73.) There was also testimony that Ganz received some assurances that action was being taken against infringing products. (S. Ganz depo. at 66–71; H. Ganz, II: 15, 19–23; H. Ganz, IX: 42–43.) Also, the jury could conclude, based on the course of events, that Ganz never promised to use its long-term relationships with its customers for purposes other than selling authentic Barney plush. There was also evidence from which the jury might conclude that there was no need for Ganz to reduce its wholesale price, or from which the jury might infer that Ganz could not do so because of Lyons' restriction on the retail pricing. (Craddock, V: 83–84; Cameron, III: 59–60; Reive, IV: 174; H. Ganz, IX: 46–47; Richards, IV: 74–78.) Finally, there was evidence from which the jury could conclude that Ganz disposed of its inventory at the best price it could obtain. (Richards, IV: 88–89.) Lyons' claim, therefore, is without merit.

Finally, with respect to this count, as above in Count I, the plaintiff has failed to meet its burden to establish that Baby Bop knock-offs present in the market in and after November 1993, reduced sales of legitimate Baby Bop. Ganz failed to offer any exhibits of the knock-off Baby Bop plush toys or evidence of the number of such knock-offs present in Canada. This is in distinct contradiction to its presentation of evidence on the Barney knock-offs. As a result of this failure of proof, the jury's verdict for the lost profits on the full 204,000 toys on which Ganz never took delivery must be reduced. Because Ganz ordered a total of 72,000 plush Baby Bop toys and sold 22,452 of these, it would have received 49,548 Baby Bops in the final shipment from Indonesia. This is approximately 24.29% of the total number of the undelivered toys. The amount of the lost profits must be reduced by this percentage, or $272,065.00, from $1,120,070.00, to $848,005.00. Moreover, in light of the jury's awarding interest on the loss suffered by Ganz in disposing of the inventory and its lost profits under this count, I must also reduce the interest amounts. The interest on lost profits is reduced by $45,663.00, from $294,883.00 to $249,220.00, and the amount of interest on the loss due to the disposition is reduced by $18,314.00, from $150,380.00 to $132,066.00. These amounts reflect that interest that would have been earned on the reduced damages. As above, I shall grant conditionally Lyons' motion for a new trial on the damages issue with respect to Baby Bop should Ganz refuse the remittitur.[8]

*Lyons' Counterclaim—Breach of Contract*

Lyons moves for a new trial, or remittitur, on its counterclaim for breach of contract, because the jury's verdict was against the great weight of the evidence and, a confusing, misleading, and prejudicial jury instruction was given on this claim. On its counterclaim, Lyons sought payment for the 204,000 items on which Ganz never took delivery.

---

8. At this point, I will also note that Lyons' claim that the jurors improperly confused the damages between the claims and had no basis for dividing them as they did is also without merit. While two separate counts were submitted to the jury, the total damages awarded did not exceed the total losses allegedly suffered by Ganz and which it attempted to prove at trial. That the jury broke them into two counts does not invalidate the award, as the submission to the jury was in separate counts. The evidence underlying the two counts shows they were interrelated and the jury was well within its prerogative to distinguish what it considered the damages associated with each count before it. Merely because the jury chose to award all of the interest claimed by Ganz under the second count, rather than dividing between the two, is insufficient to show any error. The total award does not exceed the amount Ganz argued at trial.

The defendant argues that because Ganz did not post the letter of credit for the total cost of all of the toys it ordered on June 2, 1993, as it promised to do, (Def's Exs. 84, 85), it breached the parties' agreement, thereby releasing Lyons from further performance. (Def.'s Br. at 26–28.) Further, Lyons also contends that the placement of the jury instruction on "seasonably" furnishing the letter of credit and the instruction itself, prejudiced Lyons because its placement permitted the jury to consider Ganz' defenses to Lyons' claim that arose after the plaintiff allegedly breached the contract by failing to post the credit. The jury found for Ganz and against Lyons on this claim.

■■■■■ Federal Rule of Civil Procedure 51 demands that in order to be permitted to raise the issue after trial, a party must object to the jury instructions before the jury retires to deliberate. FED. R. CIV. P. 51. "The district court has wide latitude in instructing the jury on the law" and for that reason, "'technical imperfections'" will be ignored. *Davis v. Ector County Tex.*, 40 F.3d 777, 786 (5th Cir.1994) (quoting *Bender v. Brumley*, 1 F.3d 271, 277 (5th Cir.1993)). The proffered instructions, however, should have "'no tendency to confuse or mislead the jury with respect to the applicable principles of law.'" *Id.* (quoting *Roberts v. Wal-mart Stores, Inc.*, 7 F.3d 1256, 1258 (5th Cir.1993)). Only where the charge "as a whole leaves [the court] with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations" should the court consider a new trial. *Bender v. Brumley*, 1 F.3d at 276 (citation's omitted). Lyons made an objection at trial to the placement of its instruction on Ganz' obligation to seasonably post a letter of credit. (Trial Tr. dated Aug. 19, 1996, at 19–20.)

■■■■■ There is nothing in the instructions submitted to the jury that is misleading, confusing, or prejudicial to Lyons. The instructions explained the nature of Lyons' counterclaim. They asked the jury to consider whether an agreement between the parties existed and what the terms of that agreement were, instructing it to consider the circumstances and usages of trade. The jury was asked to consider the relevant defenses raised by Ganz. Finally, the jurors were told that if the parties' agreement called for Ganz to post a letter of credit seasonably, and they concluded that Ganz did not do so, then they should find for Lyons and award it damages. The instructions apprised the jury of the applicable law and stated it correctly. The mere fact that Lyons' requested instruction, although worded differently,[9] appeared in a different position than where Lyons felt it was appropriate, is not sufficient to warrant a new trial, where the instruction is otherwise unambiguous and is a correct statement of the law.

I have not overlooked attorney's fees or the entry of judgment. I have considered it advantageous to complete the issue of a possible new trial, now dependent upon reaction to remittitur, before entering a judgment, which also needs to resolve the issue of attorney's fees. In other words, when a response to the remittitur has been made, I shall know the nature of the judgment to be entered.

**IT IS THEREFORE ORDERED** that the defendant's motion for judgment as a matter of law is hereby denied; its motion for a new trial is conditionally granted as herein stated, unless the plaintiff accepts the remittitur as stated herein on or before April 29, 1997.

---

9. Lyons submitted an instruction that read:

> You are instructed that failure of a buyer to seasonably furnish an agreed letter of credit is a breach of the contract of sale. You are further instructed that once such a breach occurred, a seller would be excused from further obligation to perform under the contract, and would be entitled to its damages.

(Sellinger Ltr. dated Aug. 18, 1996.) As noted above, the trial court has a great deal of discretion in framing the jury instructions, *Davis v. Ector County, Tex.*, 40 F.3d at 786, and it "need not give the exact language desired by the parties." *Campbell v. Vinjamuri*, 19 F.3d 1274, 1277 (8th Cir.1994). In this case, because the language used was a proper statement of the law, Lyons' claim in that regard is unavailing.